JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Allstate Insurance Company

## DEFENDANTS

Viviane Etienne, M.D., et al.

**(b)** County of Residence of First Listed Plaintiff   Cook County, IL
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Rivkin Radler, LLP, 926 RXR Plaza, Uniondale, NY 11556

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1 U.S. Government
Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                              and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
18 U.S.C. § 1962(c) and 1962(d)
Brief description of cause:
Claim for RICO, common law fraud, and unjust enrichment

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):
JUDGE  Gershon, J.

DOCKET NUMBER  CV 06-6899

DATE
08/18/2009

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

## ARBITRATION CERTIFICATION

I, Barry I. Levy_____, counsel for Plaintiff Allstate Insurance Company___ do hereby certify pursuant to the Local Arbitration Rule 83.10 that to the best of my knowledge and belief the damages recoverable in the above captioned civil action exceed the sum of $150,000 exclusive of interest and costs.

_____✓_____ Relief other than monetary damages is sought.

## DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks: see attached rider.

**Please refer to NY-E Division of Business Rule 50.1(d)(2)**

1.) Is the civil action being filed in the Eastern District of New York removed from a New York State court located in Nassau or Suffolk County: No_____

2.) If you answered "no" above:

a.) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in Nassau or Suffolk County? No_____

b.) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in the Eastern District? Yes_____

If your answer to question 2 (b) is "No", does the defendant (or a majority of the defendants, if there is more than one) reside in Nassau or Suffolk County, or, in an interpleader action, does the claimant (or a majority of the claimants, if there is more than one) reside in Nassau or Suffolk County? _____

(Note: A corporation shall be considered a resident of the County in which it has the most significant contacts).

**I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court.**

**Yes**___✓___                              **No**_____

**Are you currently the subject of any disciplinary action(s) in this or any other state or federal court?**

**Yes**_____(If yes, please explain)          **No**___✓___

_____

_____

Please provide your E-MAIL Address and bar code below. Your bar code consists of the initials of your first and last name and the last four digits of your social security number or any other four digit number registered by the attorney with the Clerk of Court.
(This information must be provided pursuant to local rule 11.1(b) of the civil rules).

**ATTORNEY BAR CODE:** BL 2190_____

**E-MAIL Address:** barry.levy@rivkin.com_____

I consent to the use of electronic filing procedures adopted by the Court in Administrative Order No. 97-12, "In re Electronic Filing Procedures(EFP)", and consent to the electronic service of all papers.

Signature: _____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

ALLSTATE INSURANCE COMPANY,

                        Plaintiff,

            -against-

VIVIANE ETIENNE, M.D.,
VIVIANE ETIENNE MEDICAL CARE, P.C.,
V.E. MEDICAL CARE, P.C.,
JAMAICA DEDICATED MEDICAL CARE, P.C.,
JASON SHEVETZ, M.D.,
SEBASTIAN MEDICAL, P.C.,
ACUTE CARE MEDICAL, P.C.,
RICHARD DOMINICK BERARDI, JR., D.O.,
ARCO MEDICAL NY, P.C.,
NEOMY MEDICAL, P.C.,
KATH MEDICAL, P.C.,
BILLY NABIL GERIS, M.D.,
JAMAICA MEDICAL PLAZA, P.C.,
YVETTE DAVIDOV, D.O.,
S&R MEDICAL, P.C.,
LEE CRAIG NAGOURNEY, M.D.,
AMETHYST MEDICAL, P.C.,
AKO MEDICAL, P.C.,
NIKOLAI LAGODUKE, M.D.,
MEDICAL POLIS, P.C.,

(collectively the "Clinic Defendants")

            -and-

CHOONG KWON KIM, M.D.,
MAGGIE MORR, M.D.,
MARAT TSIRLIN, M.D.,

(collectively the "EDX Testing Defendants"),

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Docket No.:_____ (    )

**Plaintiff Demands a
Trial by Jury**

## STATEMENT PURSUANT TO FED. R. CIV. P. 7.1

Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, the undersigned Attorney of Record for the Plaintiff, Allstate Insurance Company, certifies that Allstate Insurance Company is a wholly owned subsidiary of the Allstate Corporation, a Delaware Corporation. The stock of the Allstate Corporation is publicly traded. No publicly held entity owns 10 percent or more of the stock of the Allstate Corporation. Allstate Insurance Company does not own 10 percent or more of any publicly traded entity.

Dated: Uniondale, New York
       August 18, 2009

RIVKIN RADLER LLP

By:_____
       Barry I. Levy (BL 2190)
       Max Gershenoff (MG 4648)
     926 RXR Plaza
     Uniondale, New York  11556
     (516) 357-3000
     (516) 357-3333 (facsimile)

*Counsel for Plaintiff, Allstate Insurance Company*

AO 440 (Rev. 02/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Eastern District of New York

| | | |
|---|---|---|
| Allstate Insurance Company | ) | |
| _____ | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. |
| Viviane Etienne, M.D., et al. | ) | |
| _____ | ) | |
| *Defendant* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

See Rider "A"

A lawsuit has been filed against you.

Within 20 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Barry I. Levy, Esq. (BL 2190)
Rivkin Radler LLP
926 RXR Plaza
Uniondale, New York 11556

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____        _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 02/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.


Date: _____              _____
                                                                *Server's signature*

                                                           _____
                                                                *Printed name and title*



                                                           _____
                                                                *Server's address*

Additional information regarding attempted service, etc:

## RIDER "A"

**Case Name:**   **Allstate Insurance Company v. Viviane Etienne, M.D., et al.**

**Full Caption:**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
ALLSTATE INSURANCE COMPANY,

                    Plaintiff,

            -against-

VIVIANE ETIENNE, M.D.,
VIVIANE ETIENNE MEDICAL CARE, P.C.,
V.E. MEDICAL CARE, P.C.,
JAMAICA DEDICATED MEDICAL CARE, P.C.,
JASON SHEVETZ, M.D.,
SEBASTIAN MEDICAL, P.C.,
ACUTE CARE MEDICAL, P.C.,
RICHARD DOMINICK BERARDI, JR., D.O.,
ARCO MEDICAL NY, P.C.,
NEOMY MEDICAL, P.C.,
KATH MEDICAL, P.C.,
BILLY NABIL GERIS, M.D.,
JAMAICA MEDICAL PLAZA, P.C.,
YVETTE DAVIDOV, D.O.,
S&R MEDICAL, P.C.,
LEE CRAIG NAGOURNEY, M.D.,
AMETHYST MEDICAL, P.C.,
AKO MEDICAL, P.C.,
NIKOLAI LAGODUKE, M.D.,
MEDICAL POLIS, P.C.,

(collectively the "Clinic Defendants")

            -and-

CHOONG KWON KIM, M.D.,
MAGGIE MORR, M.D.,
MARAT TSIRLIN, M.D.,

Docket No.:_____ (     )

**Plaintiff Demands a
Trial by Jury**

Rider "A" – Page 2

(collectively the "EDX Testing Defendants"),

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**Named Defendants:  Listed Below**

**VIVIANE ETIENNE, M.D.**
149 Stokes Avenue
Freeport, New York 11520

**JASON SHEVETZ, M.D.**
1040 First Avenue, #322
New York, New York 10022

**RICHARD DOMINICK BERARDI, JR., D.O.**
9 Montrose Avenue
Summit, New Jersey 07901

**BILLY NABIL GERIS, M.D.**
1 Hemingway Court
Morganville, New Jersey 07751

**YVETTE DAVIDOV, D.O.**
15 Country Club Lane
Marlboro, New Jersey 07746

**LEE CRAIG NAGOURNEY, M.D.**
2722 Albemarle Road.
Brooklyn, New York 11226

**NIKOLAI LAGODUKE, M.D.**
7 Kinglet Avenue
Marlboro, New Jersey 07746

**CHOONG KWON KIM, M.D.**
223 Rockaway Parkway
Valley Stream, New York 11580

**MAGGIE MORR, M.D.**
 6360 98ᵗʰ Street, #F5
Rego Park, New York 11374

**MARAT TSIRLIN, M.D.**
34 Girard Street, #1
Brooklyn, New York 11235

Rider "A" -- Page 3

**VIVIANE ETIENNE MEDICAL CARE, P.C.**
C/o New York Secretary of State
41 State Street - Albany, NY 12231-0001

**V.E. MEDICAL CARE, P.C.**
C/o New York Secretary of State
41 State Street - Albany, NY 12231-0001

**JAMAICA DEDICATED MEDICAL CARE, P.C.**
C/o New York Secretary of State
41 State Street - Albany, NY 12231-0001

**SEBASTIAN MEDICAL, P.C.**
C/o New York Secretary of State
41 State Street - Albany, NY 12231-0001

**ACUTE CARE MEDICAL, P.C.**
C/o New York Secretary of State
41 State Street - Albany, NY 12231-0001

**ARCO MEDICAL NY, P.C.**
C/o New York Secretary of State
41 State Street - Albany, NY 12231-0001

**NEOMY MEDICAL, P.C.**
C/o New York Secretary of State
41 State Street - Albany, NY 12231-0001

**KATH MEDICAL, P.C.**
C/o New York Secretary of State
41 State Street - Albany, NY 12231-0001

**JAMAICA MEDICAL PLAZA, P.C.**
C/o New York Secretary of State
41 State Street - Albany, NY 12231-0001

**S&R MEDICAL, P.C.**
C/o New York Secretary of State
41 State Street - Albany, NY 12231-0001

**AMETHYST MEDICAL, P.C.**
C/o New York Secretary of State
41 State Street - Albany, NY 12231-0001

**AKO MEDICAL, P.C.**
C/o New York Secretary of State

Rider "A" – Page 4

41 State Street - Albany, NY 12231-0001

**MEDICAL POLIS, P.C.**
C/o New York Secretary of State
41 State Street - Albany, NY 12231-0001

Barry I. Levy (BL 2190)
Max Gershenoff (MG 4648)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiff, Allstate Insurance Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
ALLSTATE INSURANCE COMPANY,

                                        Plaintiff,

                                                            Docket No.:_____ (        )

        -against-

VIVIANE ETIENNE, M.D.,
VIVIANE ETIENNE MEDICAL CARE, P.C.,                **Plaintiff Demands a**
V.E. MEDICAL CARE, P.C.,                            **Trial by Jury**
JAMAICA DEDICATED MEDICAL CARE, P.C.,
JASON SHEVETZ, M.D.,
SEBASTIAN MEDICAL, P.C.,
ACUTE CARE MEDICAL, P.C.,
RICHARD DOMINICK BERARDI, JR., D.O.,
ARCO MEDICAL NY, P.C.,
NEOMY MEDICAL, P.C.,
KATH MEDICAL, P.C.,
BILLY NABIL GERIS, M.D.,
JAMAICA MEDICAL PLAZA, P.C.,
YVETTE DAVIDOV, D.O.,
S&R MEDICAL, P.C.,
LEE CRAIG NAGOURNEY, M.D.,
AMETHYST MEDICAL, P.C.,
AKO MEDICAL, P.C.,
NIKOLAI LAGODUKE, M.D.,
MEDICAL POLIS, P.C.,

(collectively the "Clinic Defendants")

        -and-

CHOONG KWON KIM, M.D.,
MAGGIE MORR, M.D.,
MARAT TSIRLIN, M.D.,

(collectively the "EDX Testing Defendants"),

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT

Plaintiff Allstate Insurance Company ("Allstate" or "Plaintiff"), by and through its counsel, Rivkin Radler LLP, as and for its Complaint against the Defendants, hereby alleges as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than One Million, Seven Hundred Eighty Thousand ($1,780,000.00) Dollars that the Defendants wrongfully have obtained from Allstate by submitting, and causing to be submitted, thousands of fraudulent bills relating to initial examinations (the "Examinations"), digital range of motion and muscle tests (the "ROM/Muscle Tests"), neurological consultations (the "Consultations") and electrodiagnostic tests (the "EDX Tests") (collectively the "Fraudulent Services"). These services purportedly were rendered for diagnostic purposes to individuals ("Insureds") who were involved in automobile accidents and were eligible for insurance coverage under Allstate insurance policies.

2.      The Defendants never had any right to bill for or to collect No-Fault Benefits for the Consultations and EDX Tests in the first instance, because the Consultations and EDX Tests were performed by independent contractors, rather than by employees of Viviane Etienne Medical Care, P.C., V.E. Medical Care, P.C., Jamaica Dedicated Medical Care, P.C., Sebastian Medical, P.C., Acute Care Medical, P.C., Arco Medical NY, P.C., Neomy Medical, P.C., Kath

2

Medical, P.C., Jamaica Medical Plaza, P.C., Amethyst Medical, P.C., AKO Medical, P.C., Medical Polis, P.C., and S&R Medical, P.C. (collectively the "PC Defendants"). In addition, the Defendants have never had any right to bill for or to collect No-Fault Benefits on their charges because the Fraudulent Services were medically useless in general, and were ordered and performed pursuant to fraudulent, pre-determined protocols that were designed and employed by the Defendants solely to maximize the potential charges that they could submit, and cause to be submitted, to Allstate.

3.      Accordingly, in addition to damages, Allstate seeks a declaration that it is not legally obligated to pay any pending claims submitted by the PC Defendants because: (i) the Fraudulent Services that were billed to Allstate through the PC Defendants were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants; and/or (ii) the PC Defendants were ineligible to bill for or recover No-Fault Benefits for the Consultations and EDX Tests because the Consultations and EDX Tests were performed by independent contractors.

4.      The Defendants fall into the following categories:

(i)      Vivienne Etienne, M.D., Jason Shevetz, M.D., Richard Dominick Berardi, Jr., D.O., Billy Nabil Geris, M.D., Lee Craig Nagourney, M.D., Nikolai Lagoduke, M.D., Yvette Davidov, D.O., Viviane Etienne Medical Care, P.C., V.E. Medical Care, P.C., Jamaica Dedicated Medical Care, P.C., Sebastian Medical, P.C., Acute Care Medical, P.C., Arco Medical NY, P.C., Neomy Medical, P.C., Kath Medical, P.C., Jamaica Medical Plaza, P.C., S&R Medical, P.C., Amethyst Medical, P.C., AKO Medical, P.C. and Medical Polis, P.C., and (collectively the "Clinic Defendants") are individuals licensed to practice medicine in the State of New York, and the professional medical corporations that they purport to own and control. The Clinic Defendants submitted charges to Allstate for medically unnecessary Fraudulent Services that they ordered and performed, or caused to be ordered and performed, pursuant to pre-determined, fraudulent protocols. In addition, the Clinic Defendants billed Allstate for

3

Consultations and EDX Tests that were performed by independent contractors, in violation of New York law.

(ii)    Choong Kwon Kim, M.D., Maggie Morr, M.D., and Marat Tsirlin, M.D., (collectively the "EDX Testing Defendants") are individuals licensed to practice medicine in the State of New York. The EDX Testing Defendants were associated with the Clinic Defendants and directly involved in the fraudulent scheme perpetrated against Allstate in that they performed the fraudulent Consultations and EDX Tests and issued reports based on the fraudulent Consultations and EDX Tests that ultimately were used to support fraudulent billing submitted to Allstate.

5.    As discussed below, the Clinic Defendants and the EDX Testing Defendants at all relevant times have known that:

(i)    the Fraudulent Services were ordered and performed – to the extent that they were performed at all – pursuant to fraudulent, pre-determined protocols designed solely to maximize charges to Allstate and other insurers, not because they were medically necessary or designed to facilitate the treatment of or otherwise benefit the Insureds who were subjected to them;

(ii)    the billing codes used for the Examinations and Consultations misrepresented and exaggerated the level of services provided in order to inflate the charges submitted to Allstate;

(iii)    the Examinations and Consultations systematically resulted in an order for EDX Tests, regardless of any Insured's unique circumstances or the fact that they were medically unnecessary;

(iv)    the ROM/Muscle Tests were duplicative of other diagnostic tests that already had been performed during the Examinations and were conducted solely to inflate the charges submitted to Allstate;

(v)    the billing codes used for the ROM/Muscle Tests and EDX Tests systematically were unbundled to inflate the charges submitted to Allstate;

(vi)    the EDX Tests billed to Allstate frequently were not even performed, and the Clinic Defendants and the EDX Testing Defendants simply copied EDX Test results from one Insured and used them to support billing for many other Insureds;

4

    (vii)    when the EDX Tests were performed, they were not performed in accordance with the minimum standards necessary to support the charges submitted to Allstate; and

    (viii)    the PC Defendants were ineligible to bill for or collect No-Fault Benefits for the Consultations and EDX Tests in the first instance, inasmuch as the Consultations and EDX Tests were performed – to the extent that they were performed at all – by independent contractors, rather than by the PC Defendants' employees.

6.    As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services. The charts attached hereto as Exhibits "1" through "7" set forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to Allstate. The Defendants' respective interrelated schemes began as early as 2002 and have continued uninterrupted since that time. As a result of the Defendants' interrelated schemes, Allstate has incurred damages of more than One Million Seven Hundred Eighty Thousand ($1,780,000.00) Dollars.

## THE PARTIES

### I.    Plaintiff

7.    Plaintiff Allstate Insurance Company is an Illinois corporation with its principal place of business in Northbrook, Illinois.  Allstate is authorized to conduct business and to issue automobile insurance policies in the State of New York.

### II.    Defendants

8.    Defendant Viviane Etienne, M.D. ("Dr. Etienne") is a physician who was licensed to practice medicine in New York in 1991, and who resides in and is a citizen of the State of New York. Dr. Etienne purports to be the sole owner, shareholder, and director of Defendants Viviane Etienne Medical Care, P.C., V.E. Medical Care, P.C., and Jamaica Dedicated Medical Care, P.C.

9.      Defendant Jason Shevetz, M.D. ("Dr. Shevetz") is a physician who was licensed to practice medicine in New York in 2002, and who resides in and is a citizen of the State of New York. Dr. Shevetz purports to be the sole owner, shareholder, and director of Defendants Sebastian Medical, P.C. and Acute Care Medical, P.C.

10.     Defendant Richard Dominick Berardi, Jr., D.O. ("Dr. Berardi") is a physician who was licensed to practice medicine in New York in 1991, and who resides in and is a citizen of the State of New Jersey. Dr. Berardi purports to be the sole owner, shareholder, and director of Defendants Arco Medical NY, P.C., Neomy Medical, P.C., and Kath Medical, P.C.

11.     Defendant Billy Nabil Geris, M.D. ("Dr. Geris") is a physician who was licensed to practice medicine in New York in 1996, and who resides in and is a citizen of the State of New Jersey. Dr. Geris purports to be the sole owner, shareholder, and director of Defendant Jamaica Medical Plaza, P.C.

12.     Defendant Yvette Davidov, D.O. ("Dr. Davidov") is a physician who was licensed to practice medicine in New York in 2000, and who resides in and is a citizen of the State of New Jersey. Dr. Davidov purports to be the sole owner, shareholder, and director of Defendant S&R Medical, P.C.

13.     Defendant Lee Craig Nagourney, M.D. ("Dr. Nagourney") is a physician who was licensed to practice medicine in New York in 1983, and who resides in and is a citizen of the State of New York. Dr. Nagourney purports to be the sole owner, shareholder, and director of Defendants Amethyst Medical, P.C. and AKO Medical, P.C.

14.     Defendant Nikolai Lagoduke, M.D. ("Dr. Lagoduke") is a physician who was licensed to practice medicine in New York in 2004, and who resides in and is a citizen of the

State of New Jersey. Dr. Lagoduke purports to be the sole owner, shareholder, and director of Defendant Medical Polis, P.C.

15.     Defendant Viviane Etienne Medical Care, P.C. ("VEMC") is a New York professional service corporation with its principal place of business in New York. VEMC was incorporated on or about April 26, 2004.

16.     Defendant V.E. Medical Care, P.C. ("VE") is a New York professional service corporation with its principal place of business in New York. VE was incorporated on or about December 19, 2002.

17.     Defendant Jamaica Dedicated Medical Care, P.C. ("JDMC") is a New York professional service corporation with its principal place of business in New York. JDMC was incorporated on or about September 25, 2006.

18.     Defendant Sebastian Medical, P.C. ("Sebastian") is a New York professional service corporation with its principal place of business in New York. Sebastian was incorporated on or about June 6, 2005.

19.     Defendant Acute Care Medical, P.C. ("Acute") is a New York professional service corporation with its principal place of business in New York. Acute was incorporated on or about July 11, 2006.

20.     Defendant Arco Medical NY, P.C. ("Arco") is a New York professional service corporation with its principal place of business in New York. Arco was incorporated on or about June 16, 2006.

21.     Defendant Neomy Medical, P.C. ("Neomy") is a New York professional service corporation with its principal place of business in New York. Neomy was incorporated on or about October 3, 2005.

22.     Defendant Kath Medical, P.C. ("Kath") is a New York professional service corporation with its principal place of business in New York. Kath was incorporated on or about May 2, 2008.

23.     Defendant Jamaica Medical Plaza, P.C. ("JMP") is a New York professional service corporation with its principal place of business in New York. JMP was incorporated on or about June 18, 2007.

24.     Defendant S&R Medical, P.C. ("S&R") is a New York professional service corporation with its principal place of business in New York. S&R was incorporated on or about December 3, 2004.

25.     Defendant Amethyst Medical, P.C. ("Amethyst") is a New York professional service corporation with its principal place of business in New York. Amethyst was incorporated on or about March 13, 2006.

26.     Defendant AKO Medical, P.C. ("AKO") is a New York professional service corporation with its principal place of business in New York. AKO was incorporated on or about January 14, 2008.

27.     Defendant Medical Polis, P.C. ("MP") is a New York professional service corporation with its principal place of business in New York. MP was incorporated on or about May 25, 2007.

28.     Defendant Choong Kwon Kim, M.D. ("Dr. Kim") is a physician who was licensed to practice medicine in New York in 1976, and who resides in and is a citizen of the State of New York. Dr. Kim was associated with VE, VEMC, JDMC, Arco, Kath, and MP and at all relevant times worked in the capacity of an independent contractor.

29.     Defendant Maggie Morr, M.D. ("Dr. Morr") is a physician who was licensed to practice medicine in New York in 2004, and who resides in and is a citizen of the State of New York. Dr. Morr was associated with JDMC and Arco and at all relevant times worked in the capacity of an independent contractor.

30.     Defendant Marat Tsirlin, M.D. ("Dr. Tsirlin") is a physician who was licensed to practice medicine in New York in 2004, and who resides in and is a citizen of the State of New York. Dr. Tsirlin was associated with S&R, Neomy, Amethyst, JMP and AKO and at all relevant times worked in the capacity of an independent contractor.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

32.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.    An Overview of the No-Fault Laws

33.    Allstate underwrites automobile insurance in the State of New York.

34.    New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the medically necessary healthcare services that they require. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.) (collectively referred to hereinafter as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

35.    No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for healthcare goods and services.

36.    An Insured can assign his or her right to No-Fault Benefits to healthcare services providers in exchange for those services. Pursuant to a duly executed assignment, a healthcare services provider may submit claims directly to an insurance company and receive payment for medically necessary services that it provides, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").

37.    Pursuant to the No-Fault Laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or … upon assignment by the applicant … shall pay benefits <u>directly</u> to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

38.     Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the actual provider of the service. Under the New York No-Fault Laws, a professional service corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

39.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3s submitted by a healthcare provider to Allstate, and to all other insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     The Defendants' Respective Roles In The Scheme

40.     The Clinic Defendants are individuals licensed to practice medicine in the State of New York, and the professional medical corporations (<u>i.e.</u> the PC Defendants) that they purport to own and control. The Clinic Defendants submit charges to Allstate for the Fraudulent Services that they themselves order and supposedly perform, as well as those supposedly performed by the EDX Testing Defendants.  The Defendants purport to treat patients at multiple facilities in the New York City Metropolitan region that they own or work from, and which cater to high volumes of fully-ambulatory Insureds.

11

41.     The EDX Testing Defendants are New York-licensed physicians who associate themselves with the Clinic Defendants as independent contractors and are directly involved in the fraudulent scheme perpetrated against Allstate. The EDX Testing Defendants accept referrals from the Clinic Defendants, conduct or purport to conduct fraudulent Consultations and EDX Tests, and issue fraudulent reports and findings based on the performance or purported performance of the Consultations and EDX Tests.

42.     Each category of Defendants is a necessary part of, and critical to the success of, the fraudulent scheme. For example, the Examinations and referrals made by the Clinic Defendants to the EDX Testing Defendants are a necessary part of, and critical to, the success of the fraudulent scheme because – without the referrals – the EDX Testing Defendants would not be in a position to perform the Consultations and EDX Tests, which in turn permit the Clinic Defendants to bill Allstate and collect payment for the Fraudulent Services. Similarly, without the EDX Testing Defendants' performance of the Consultations and EDX Tests, the Clinic Defendants would not be able to bill Allstate and collect payment for the Fraudulent Services.

43.     In addition, both categories of Defendants benefit from each other's participation in the scheme. One the one hand, the Clinic Defendants benefit from the scheme because: (i) they bill and collect money from Allstate and other insurers for the fraudulent charges associated with the Consultations and EDX Tests, and (ii) the EDX Test results are used to justify a laundry list of additional medical services that are performed on Insureds for which the Clinic Defendants in turn bill and collect money from Allstate. On the other hand, the EDX Testing Defendants receive payment from the Clinic Defendants and financially enrich themselves as a result of performing the Fraudulent Consultations and EDX Tests.

## AN OVERVIEW OF THE SCHEME

**I.    Introduction**

44.    This case involves a series of independent but related schemes through which the Clinic Defendants bill Allstate and other automobile insurers for a series of fraudulent medical services, including the Examinations, Consultations, ROM/Muscle Tests and EDX Tests. Although each scheme was operated and managed through separate members of the Clinic Defendants, the overall scheme was virtually identical among every associated group of Clinic Defendants, with each having a common and essential core component, i.e., the association with the EDX Testing Defendants.

45.    The details of the scheme are summarized below.

**II.    Part 1 - Fraudulent Billing for Independent Contractor Services**

46.    The first part of the Defendants' fraudulent scheme involves the submission of claims to Allstate seeking payment for services performed by independent contractors. Under the No-Fault Laws, professional service corporations are ineligible to bill or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

47.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the No-Fault Laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify

13

position set forth in February 21, 2001 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); See DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS) (Copies of the relevant DOI Opinion letters are attached hereto as Exhibit "8").

48.     The PC Defendants were ineligible to bill for or to collect No-Fault Benefits for the Consultations and EDX Tests because such services that were billed through the professional corporations were provided by the EDX Testing Defendants – who were never employees of the PC Defendants, but rather were independent contractors.

49.     More specifically, in furtherance of the Defendants' fraudulent scheme, virtually every bill submitted through the PC Defendants to Allstate seeking payment for Consultations and EDX Tests either: (i) identified one or more of the EDX Testing Defendants as the physician claimed to have performed the services and misrepresented that the pertinent EDX Testing Defendant was the relevant PC Defendant's employee; or (ii) failed to identify which physician performed the services in a deliberate attempt to conceal the fact that the physicians who performed the services were independent contractors. (Representative examples of NF-3 forms submitted to Allstate by the PC Defendants are attached collectively as Exhibit "9"). In fact, the physicians who were claimed to have performed the services never were employees of the Clinic Defendants. The Clinic Defendants billed for the services as if they were provided by actual

14

employees of the PC Defendants in order to make it appear as if the services were eligible for reimbursement. The Clinic Defendants' misrepresentations were consciously designed to mislead Allstate into believing that it was obligated to pay for the Consultations and EDX Tests, when in fact Allstate was not.

50.     The physicians who allegedly performed the services that were billed to Allstate through the PC Defendants (i.e. the EDX Testing Defendants) were treated as independent contractors by the Clinic Defendants in an effort to avoid paying taxes, worker's compensation, and meeting other legal obligations.  For instance, the Clinic Defendants:

(i)     paid the EDX Testing Defendants on a 1099 basis rather than a W-2 basis;

(ii)    established an understanding with the EDX Testing Defendants that they were independent contractors, rather than employees;

(iii)   paid no employee benefits to the EDX Testing Defendants;

(iv)    failed to secure and maintain W-4 or I-9 forms for the EDX Testing Defendants;

(v)     failed to withhold federal, state or city taxes on behalf of the EDX Testing Defendants;

(vi)    required the EDX Testing Defendants to pay for their own malpractice insurance at their own expense;

(vii)   failed to cover the EDX Testing Defendants either for unemployment or workers' compensation benefits; and

(viii)  filed corporate and payroll tax returns (e.g. Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the EDX Testing Defendants are independent contractors.

51.     The absence of an employer-employee relationship is further demonstrated by the fact that the EDX Testing Defendants: (i) provided their own equipment; (ii) set their own schedules and days on which they performed services; and, significantly, (iii) maintained non-

exclusive relationships, and contemporaneously performed services for their own practices and on behalf of other medical practices which were in direct competition with one another. In fact, between 2005 and 2008, the EDX Testing Defendants rendered services at more than twenty five (25) separate medical clinics in the New York metropolitan region. In addition to the PC Defendants, the medical clinics from which the EDX Testing Defendants rendered services included the following:

| Clinic | Address | Purported Owner |
|--------|---------|-----------------|
| WW Medical Center, PC | 1414 Utica Ave., Brooklyn | Dr. Wilkins Williams |
| Michael Alleyne MD, PC | 489 Brook Ave., Bronx | Dr. Michael Alleyne |
| Foster Comprehensive Medical, PC | 1414 Utica Ave., Brooklyn | Dr. Wilkins Williams |
| Ahava Medical, PC | 4256 Bronx Blvd., Bronx | Dr. Gracia Mayard |
| Avenue I Medical, PC | 1401 Ocean Ave., Brooklyn | Dr. Ricardo Galdamez |
| Bronx Mega Care Medical | 1862 East Tremont Ave., Bronx | Dr. Rafael Delacruz Gomez |
| Dr. Richard Medical, PC | 2511 Avenue I, Brooklyn | Dr. Ricardo Galdamez |
| Flatlands Medical, PC | 8008 Flatlands Ave., Brooklyn | Dr. Barry Dublin |
| Foster Medical Group, PC | 98-07 Foster Ave., Brooklyn | Dr. Pavel Yutsis |
| Lifespan Medical, PC | 3858 Nostrand Avenue, Brooklyn | Dr. Hu-Nam Nam |
| South Bronx Medical, PC | 597-599 Southern Blvd., Bronx | Dr. Jose Martinez-Roura |
| VAS Medical, PLLC | 963 Coney Island Ave., Brooklyn | Dr. Victor Sharobeem |
| Cure Medical Services, PC | 7211 20th Ave., Brooklyn | Dr. Eddy Rodriguez |
| Essential Medical Care, PC | 17213 Hillside Ave., Queens | Dr. Hu Nam-Nam |
| Allmed Medical of Williamsburg, PC | 922 Broadway, Brooklyn | Dr. Michael Bley |

52.    By electing to treat the EDX Testing Defendants as independent contractors, the Clinic Defendants realize significant economic benefits – for instance:

(i)    avoiding the obligation to collect and remit the income tax owed by the EDX Testing Defendants as required by 26 U.S.C. § 3102;

(ii)    avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

> (iii)    avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);
>
> (iv)    avoiding payment of workers' compensation insurance to cover the EDX Testing Defendants as required by New York Workers' Compensation Law § 10;
>
> (v)    avoiding the need to secure any malpractice insurance to cover the EDX Testing Defendants; and
>
> (vi)    avoiding claims of agency-based liability arising from the EDX Testing Defendants' work.

53.    Because the EDX Testing Defendants are independent contractors and perform the Consultations and EDX Tests, the PC Defendants never had any right to bill for or collect No-Fault Benefits in connection with those services.

## III.    Part 2 - Defendants' Fraudulent Treatment and Billing Scheme

54.    The second part of the Defendants' fraudulent scheme involves the performance of medically useless services according to pre-determined, fraudulent protocols. Each step in the fraudulent protocols is designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step. For instance:

> (i)    the Examinations are performed to provide a false basis for the ROM/Muscle Tests and Consultations;
>
> (ii)    the Consultations, in turn, are performed to justify the Examinations and ROM/Muscle Tests and to provide a false basis for the EDX Tests; and
>
> (iii)    the EDX Tests are performed and used to reinforce the purported "necessity" for additional ROM/Muscle Tests, as well as a laundry list of other medically unnecessary services.

55.    The Defendants created this fraudulent protocol solely to enrich themselves, without regard for the fact that it subjects patients to medically useless procedures.

## A.      The Fraudulent Initial Examinations

56.      When an Insured arrives at one of the Clinic Defendants' offices, he or she always receives an initial Examination.

57.      The initial Examination then is billed to Allstate separate and independent of the other Fraudulent Services. The charges for the initial Examinations are fraudulent inasmuch as they typically are billed either under billing codes 99205 (almost always resulting in a charge of $182.18), 99244 (almost always resulting in a charge of $182.18), or 99245 (almost always resulting in a charge of $230.09).

58.      According to the New York Workers' Compensation Fee Schedule, which is applicable to claims for No-Fault Benefits (the "Fee Schedule"), the use of billing codes 99205, 99244, and 99245 typically requires that the patient present with a problem of moderate-to-high severity. However, the Insureds who seek treatment and care from the Clinic Defendants have problems – to the extent that there are any – of low severity.  Additionally, according to the Fee Schedule, the use of billing code 99244 requires that the pertinent Examination involve medical decision-making of moderate complexity, and the use of billing codes 99205 and 99245 requires that the Examination involve medical decision-making of high complexity. The use of billing code 99205, 99244, and 99245 in virtually every instance further materially misrepresents and exaggerates the level of medical decision-making and services provided by the Clinic Defendants, inasmuch as the initial Examinations do not involve any medical decision-making at all – considering that the outcomes of the Examinations are pre-determined. Specifically, following almost every initial Examination, regardless of their individual circumstances or unique presentment, the Insureds: (i) receive a boilerplate diagnosis of "headache," "pain," and/or "sprain/strain"; (ii) are told to return to the Clinic Defendants several times per week for

18

follow-up examinations and a laundry-list of medically unnecessary services, including ROM/Muscle Tests; and (iii) are referred to the EDX Testing Defendants or other independent contractors for a Consultation.

59.     Furthermore, the use of billing codes 99205 and 99244 contemplates that the physician generally spend 60 minutes face-to-face with the patient and/or the patient's family, whereas billing code 99245 contemplates that the physician generally spend 80 minutes face-to-face with the patient and/or the patient's family. The use of codes 99205, 99244, and 99245 in billing for the initial Examinations materially misrepresented and exaggerated the level of services provided by the PC Defendants, and is used solely to inflate the charges for each Examination. For example:

    (i)    In an NF-3 form submitted to Allstate by VE on September 25, 2007, VE represented that Dr. Etienne conducted an Initial Examination of a patient named Patient "1" (Identity Redacted) on August 21, 2007. While VE billed for the Examination under billing code 99244, Patient "1" testified at an April 30, 2008 examination under oath that this Examination lasted only 30 minutes.

    (ii)    In an NF-3 form submitted to Allstate by VE on January 22, 2008, VE represented that Dr. Etienne conducted an Initial Examination of a patient named Patient "2" (Identity Redacted) on December 20, 2007. While VE billed for the Examination under billing code 99244, Patient "2" testified at a May 13, 2008 examination under oath that this Examination lasted only 15 minutes.

    (iii)    In an NF-3 form submitted to Allstate by JDMC on January 29, 2008, JDMC represented that Dr. Etienne conducted an Initial Examination of a patient named Patient "3" (Identity Redacted) on January 11, 2008. While JDMC billed for this Examination under billing code 99244, Patient "3" testified at a May 12, 2008 examination under oath that the Examination lasted only 10 minutes. Furthermore, while JDMC represented that Dr. Etienne conducted the initial Examination, Patient "3" testified that a male physician conducted the Examination.

    (iv)    In an NF-3 form submitted to Allstate by VE on February 2, 2008, VE represented that Dr. Etienne conducted an initial Examination of a patient

named Patient "4" (Identity Redacted) on January 22, 2008. While VE billed for this Examination under billing code 99244, Patient "4" testified at an April 30, 2008 examination under oath that this Examination lasted only 30 minutes.

(v)     In an NF-3 form submitted to Allstate by JDMC on February 11, 2008, JDMC represented that Dr. Etienne conducted an initial Examination of a patient named Patient "5" (Identity Redacted) on January 23, 2008. While JDMC billed for this Examination under billing code 99244, Patient "5" testified at a May 9, 2008 examination under oath that the Examination lasted only 15 minutes.

(vi)    In an NF-3 form submitted to Allstate by S&R on August 1, 2008, S&R represented that Dr. Davidov conducted an initial Examination of a patient named Patient "6" (Identity Redacted) on June 26, 2008. While S&R billed for this Examination under billing code 99245, Patient "6" testified at an October 28, 2008 examination under oath that the Examination lasted only 30 minutes.

Copies of the fraudulent NF-3 Forms referred to above (patient names are redacted) are attached hereto as Exhibit "10".

## B.    The Fraudulent ROM/Muscle Tests

60.    In an attempt to maximize the fraudulent billing that they submit or cause to be submitted for each Insured, following the initial Examination the Clinic Defendants instruct each Insured to return for one or more rounds of medically useless ROM/Muscle Tests.

### 1.    Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength

61.    The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged or ball-and-socket variety. The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a leg, rotate a shoulder, or move the neck to one side.

62.    The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion." Stated in a more illustrative way, range

of motion is the amount that a joint will move from a straight position to its bent or hinged position.

63.     A traditional, or manual, range of motion test consists of a non-electronic measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint. In a traditional range of motion test, the physician asks the patient to move his or her joints at various angles, or the physician moves the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

64.     Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body in a given direction against resistance applied by the physician.  For example, if a physician wanted to measure muscle strength in the muscles surrounding a patient's knee, he would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

65.     Physical examinations performed on patients with soft-tissue trauma necessarily require range of motion and muscle strength tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning. Unless a physician knows the extent of a given patient's joint or muscle strength impairment, there is no way to properly diagnose or treat the patient's injuries. Evaluation of range of motion and muscle strength are an essential component of the "hands-on" examination of a trauma patient. Since range of motion and muscle strength tests must be conducted as an element of a soft-tissue trauma patient's initial Examination, as well as during any follow-up examinations, the Fee Schedule provides that range of motion and muscle strength tests are to be reimbursed as an element of the initial Examinations and follow-

up examinations. In other words, healthcare providers cannot conduct and bill for an initial Examination or follow-up examination, then bill separately for contemporaneously-provided ROM/Muscle Tests.

**2.    The Clinic Defendants' Duplicate Billing for ROM/Muscle Tests**

66.    The Clinic Defendants conduct manual range of motion and muscle testing on each Insured during every initial Examination and follow-up examination. The charges for these tests are part and parcel of the charges that the Clinic Defendants submit for the initial Examinations under billing codes 99205, 99244, and 99245, and for follow-up examinations under billing code 99214.

67.    Despite the fact that every Insured already has undergone manual range of motion and muscle strength testing during their initial Examinations and follow-up examinations, and despite the fact that reimbursement already has been paid by Allstate as a component of the initial Examination and/or follow-up examinations, the Clinic Defendants systemically bill for, and purport to perform, a series of digital ROM/Muscle Tests on virtually every Insured.

68.    Though the Insureds already visit the Clinic Defendants several times per week for follow-up examinations and physical therapy, the Clinic Defendants often deliberately schedule separate appointments for ROM/Muscle Tests so that they can bill for those procedures separately, without having to include them in the billing for the follow-up examinations, as required by the Fee Schedule.

69.    The Clinic Defendants conduct the range of motion component of the ROM/Muscle Tests by placing a digital inclinometer or goniometer on various parts of the Insureds' bodies (affixed by Velcro straps) while the Insured is asked to attempt various motions and movements.  The test is virtually identical to the manual range of motion testing that is

described above and that is performed during each initial Examination and follow-up examination, except that a digital printout is obtained rather than the provider manually documenting the range of motion.

70.     The Clinic Defendants conduct the muscle strength component of the ROM/Muscle Tests by placing a strain gauge type measurement apparatus against a stationary object, against which the patient presses three-to-four separate times using various muscle groups. As with the range of motion component of the ROM/Muscle Tests, this muscle strength test is virtually identical to the manual muscle strength testing that is described above and that is performed during the initial Examinations and follow-up examinations – except that a digital printout is obtained.

71.     The information gained through the use of the ROM/Muscle Tests is not significantly different from the information obtained through the manual testing that is part and parcel of the initial Examination and follow-up examinations. In the relatively minor soft-tissue injuries allegedly sustained by the Insureds, the difference of a few percentage points in the Insured's range of motion reading or pounds of resistance in the Insured's muscle strength testing is meaningless. Indeed, this is evidenced by the fact that the Clinic Defendants almost never incorporate the results of the ROM/Muscle Tests into the rehabilitation programs of any of the Insureds that they purport to treat.

72.     While ROM/Muscle Tests can be a medically useful tool as part of a research project, under the circumstances employed by the Clinic Defendants it represents purposeful and unnecessary duplication of the manual range of motion and muscle strength testing conducted during the initial Examinations and follow-up examinations. The ROM/Muscle Tests are part and parcel of the Clinic Defendants' fraudulent schemes, inasmuch as the "service" is rendered

pursuant to a pre-established protocol that: (i) in no way aids in the assessment and treatment of the Insureds; and (ii) is designed solely to financially enrich the Clinic Defendants.

### 3.   The Clinic Defendants' Fraudulent Unbundling of ROM/Muscle Tests

73.   Not only do the Clinic Defendants deliberately conduct duplicative, medically unnecessary ROM/Muscle Tests, they also unbundle the tests in order to maximize the fraudulent charges that they can submit to Allstate.

74.   For instance, the Clinic Defendants submit several bills per Insured for several rounds of ROM/Muscle Tests – each seeking reimbursement in the range of $600.00 to $900.00 for each round of ROM/Muscle Tests. Each of these bills submitted for digital range of motion testing represents fraudulent unbundling for the following reasons:

(i)   Each bill misrepresents, using duplicate entries of billing code 95851 or 95852, that a large number of separate range of motion measurements are performed on each Insured and that, therefore, the Clinic Defendants are entitled to bill Allstate $45.71 for each measurement, separate and independent from one another. In fact, only a handful of reimbursable measurements are performed on each Insured – to the extent that any measurements are performed at all.

(ii)   According to the Fee Schedule, a healthcare provider seeking reimbursement for range of motion measurements may only bill 5.41 units (i.e., $45.71) for each "extremity" or "trunk section" on which the measurements are taken. In actuality, the units identified as separately reimbursable on each bill are not separate extremity or trunk section measurements but, rather, are repeated measurements of the same extremity or trunk section. For example, rather than seeking reimbursement for $45.71 for the range of motion measurement of an Insured's cervical spine or lumbar spine (i.e., two sections of an Insured's "trunk"), each bill represents that reimbursement of $45.71 is due for each measurement taken based upon the individual movement made by the Insured (i.e. cervical flexion and extension, lumbar rotation, etc.). Described another way, every time an Insured rotates his body in a different direction, or bends his/her elbow or knee, which takes seconds, the Clinic Defendants submit a charge to Allstate for $45.71 per movement.

24

(iii)   Assuming that measurements of an Insured's trunk or extremities actually are performed by the Clinic Defendants, the most that they are entitled to bill Allstate for the services rendered is $200.00 to $300.00 per Insured – to cover measurements of the trunk sections and the extremities.  As a result of the misrepresentations made on the bills that are submitted to Allstate by the Clinic Defendants, the Clinic Defendants frequently defraud Allstate into paying hundreds of additional dollars per Insured, often two-to-three times as much as they are entitled to be paid – to the extent that they are entitled to be paid for the duplicative ROM/Muscle Tests at all.

75.    In addition, the Clinic Defendants regularly submit bills for digital muscle testing that are fraudulently unbundled for the following reasons:

(i)    Each of these bills misrepresents, using duplicate entries of billing code 95831, that a large number of separate muscle measurements are performed on each Insured and that, therefore, the Clinic Defendants are entitled to bill Allstate $43.60 for each measurement, separate and independent from one another. In fact, only a handful of reimbursable measurements are performed on each Insured – to the extent that any measurements are performed at all.

(ii)   According to the Fee Schedule, a healthcare provider seeking reimbursement for muscle testing measurements may only bill 5.16 units (i.e., $43.60) for each "extremity" or "trunk section" on which the measurements are taken. In actuality, the units identified as separately reimbursable on each bill are not separate trunk section or extremity measurements but, rather, are repeated measurements of the same trunk section and extremities. For example, rather than seeking reimbursement for $43.60 for the muscle test measurement of an Insured's neck, right shoulder, or left hip (i.e., sections of an Insured's "trunk" and "extremities"), each bill represents that reimbursement of $43.60 is due for each measurement taken based upon the individual movement made by the Insured (i.e. neck extension and flexion, left shoulder abduction, extension, and flexion, right hip abduction, extension, and flexion, etc.) Described another way, every time an Insured moves his/her arms, legs, or neck in a different direction against the strain gauge, which takes seconds, the Clinic Defendants submit a charge to Allstate for $43.60 per movement.

(iii)  Assuming that measurements of an Insured's trunk and extremity strength actually are performed by the Clinic Defendants, the most that they are entitled to bill Allstate for the services rendered is $200.00 to $300.00 per Insured – to cover measurements of the trunk sections and the extremities.

25

As a result of the misrepresentations made on the bills that are submitted to Allstate by the Clinic Defendants, the Clinic Defendants frequently defraud Allstate into paying two-to-three times as much as they are entitled to be paid – to the extent that they are entitled to be paid the duplicative ROM/Muscle Tests at all.

Examples of the fraudulent bills associated with the ROM/Muscle Testing in relation to each group of Clinic Defendants (patients names are redacted) are attached hereto as Exhibit "11".

### C.    The Fraudulent Consultations

76.    Based upon the fraudulent, pre-determined outcome of the Initial Examinations, the Clinic Defendants refer virtually every Insured for a Consultation with one or another of the EDX Testing Defendants. Typically, the Consultations are billed separately from the EDX Tests, though in some cases they are billed as part of the EDX Tests.

77.    Like the initial Examinations, the Consultations are fraudulent inasmuch as they always are billed under billing code 99244 (resulting in charges of $182.18) or 99245 (resulting in charges of $230.09), yet they involve no actual medical decision-making. This is because the outcomes are pre-determined – virtually every Insured treated at the Clinic Defendants automatically is "diagnosed" with "derangement" or "sprain/strain" in their back. These diagnoses uniformly are arrived at by the EDX Testing Defendants, and are rendered without regard for patient presentment, solely in order to maximize the amount of billing that the Clinic Defendants can submit for each Insured.

78.    Based upon these bogus diagnoses, the EDX Testing Defendants then make the pre-determined "conclusion" that the Insureds require the EDX Tests to rule out cervical and/or lumbar radiculopathy. The Clinic Defendants require that the EDX Testing Defendants or other independent contractors arrive at these pre-determined conclusions in order to fraudulently maximize the charges that can be submitted for each individual Insured. The EDX Testing

26

Defendants are part of and amenable to this scheme because of the financial remuneration provided by the Clinic Defendants. Examples of the fraudulent bills associated with the Consultations in relation to each of the EDX Testing Defendants and each group of Clinic Defendants (patient names are redacted) are attached hereto as Exhibit "12".

### D. The Fraudulent EDX Tests

79.     Based upon the pre-determined results of the Examinations and Consultations, the EDX Testing Defendants purport to perform and interpret the EDX Tests for virtually every Insured, namely electromyography tests ("EMGs") and nerve conduction velocity tests ("NCVs").

### 1. The Human Nervous System and Electrodiagnostic Testing

80.     The human nervous system is composed of the brain, spinal cord and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

81.     The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves. Peripheral nerves consist of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs. The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called

27

a radiculopathy, and can cause various symptoms including pain, altered sensation and loss of muscle control.

82.     EMGs and NCVs both are forms of electrodiagnostic tests, and purportedly are performed and interpreted by the EDX Testing Defendants or other independent contractors affiliated with the Clinic Defendants because they allegedly are medically necessary to determine whether the Insureds have radiculopathies.

83.     The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies. (A copy of the Recommended Policy is annexed hereto as Exhibit "13"). The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

84.     The EDX Testing Defendants' pre-determined, uniform package of EDX Tests stands in marked contrast to the Recommended Policy in several major respects. For instance, the Recommended Policy states that the maximum number of NCVs and EMGs necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCVs of three motor nerves; (ii) NCVs of two sensory nerves; (iii) two H-reflex studies; and (iv) EMGs of two limbs. In an attempt to extract the maximum amount of billing out of each Insured, however:

> (i)     Dr. Kim virtually always performs: (a) EMGs of four limbs; (b) NCVs of eight motor nerves, comprised of two separate motor nerve NCVs of four motor nerves, each; and (c) NCVs of 10 sensory nerves, comprised of two

separate sensory nerve NCVs, one of six sensory nerves and the other of four sensory nerves;

(ii)    Dr. Morr regularly performs: (a) EMGs of four limbs; (b) NCVs of eight motor nerves, comprised of two separate motor nerve NCVs of four motor nerves, each; and (c) NCVs of 10 sensory nerves, comprised of two separate sensory nerve NCVs, one of six sensory nerves and the other of four sensory nerves; and

(iii)    Dr. Tsirlin regularly performs: (a) EMGs of four limbs; (b) NCVs of eight motor nerves, frequently comprised of two separate motor nerve NCVs of four motor nerves, each; and (c) NCVs of eight sensory nerves, frequently comprised of two separate motor nerve NCVs of four motor nerves, each.

85.    Furthermore, though the Recommended Policy appropriately recognizes that NCVs and EMGs have demonstrated usefulness in diagnosing radiculopathies, it explains that the decision of which, if any, of the electrodiagnostic tests to perform should be individually tailored to address the unique circumstances of each patient. However, the EDX Testing Defendants' pre-determined package of EDX Tests does not address the unique circumstances of each patient. Rather, virtually every Insured receives the same EDX Tests on the same nerves.

86.    The EDX Testing Defendants' pre-determined package of Consultations and EDX Tests is conducted solely for the purpose of enabling the Clinic Defendants to submit large-scale, fraudulent charges to Allstate and other insurers through the PC Defendants. For example, for each insured that is "treated" by the EDX Testing Defendants, these charges typically include – at a minimum:

| CPT Code | Service | Charge |
|---|---|---|
| 99244/99245 | 60/80 minute office consultation for new or established patient. | $182.18/$230.09 |
| 95864/95861 | Four extremity EMG with paraspinal areas/ two separate two extremity EMGs with paraspinal areas | $408.64/$483.00 |
| 95903 | Four upper motor nerve NCV study – with F wave study | $665.88 |

| 95903 | Four lower motor nerve NCV study -- with F wave study | $665.88 |
| 95904 | Four/six upper sensory nerve NCV study | $425.88/$638.82 |
| 95904 | Four lower sensory nerve NCV study | $425.88 |
| 95934 | Two lower nerve H-reflex study | $239.98 |
| | | |
| | **TOTAL:** | $3,014.32 - $3,349.53 |

Examples of the fraudulent bills associated with the EDX Tests in relation to each of the EDX Testing Defendants and each group of Clinic Defendants are attached hereto as Exhibit "14".

87.    In a significant percentage of Insureds, the charges submitted by or through the Clinic Defendants are increased by an order of magnitude because, as discussed herein, the Defendants routinely unbundle the NCV and EMG charges. Accordingly, the Clinic Defendants frequently submit bills for fraudulent EDX Test charges to Allstate that exceed $3,600.00 per Insured.

**2.    The Fraudulent NCVs**

88.    NCVs are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is measured and recorded with electrodes attached to the surface of the skin. An EMG machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance (the "conduction velocity"). In addition, the EMG machine displays the changes in amplitude over time as a "waveform". The amplitude, latency, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

89.     There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCVs. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCVs.

90.     F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV studies. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

91.     The decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCVs are performed on particular peripheral nerves and their sensory and/or motor fibers. As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCVs should vary from patient-to-patient. Likewise, the decision regarding whether to conduct F-wave or H-reflex studies should vary from patient-to-patient according to the individual patient's clinical presentation and the evolving electrodiagnostic study results.

92.     The EDX Testing Defendants do not tailor the NCVs that they perform to the unique circumstances of each individual Insured. Instead, they apply a fraudulent "protocol" and perform NCVs on the same peripheral nerves and nerve fibers for virtually every insured. Specifically, the EDX Testing Defendants test the following peripheral nerves and nerve fibers

on almost every Insured: (i) left and right median motor nerves; (ii) left and right peroneal motor nerves; (iii) left and right tibial motor nerves; (iv) left and right ulnar motor nerves; (v) left and right median sensory nerves; (vi) left and right radial sensory nerves; (vii) left and right superficial peroneal sensory nerves; (viii) left and right sural sensory nerves; and (ix) left and right ulnar sensory nerves.

93.     The EDX Testing Defendants' cookie-cutter approach to the NCVs that they perform on virtually every Insured clearly is not based on medical necessity. Instead, the EDX Testing Defendants' cookie-cutter approach with the NCVs is designed solely to maximize the charges that the Clinic Defendants can submit to Allstate and other insurers, to maximize ill-gotten profits for the Clinic Defendants, and to ensure that the Clinic Defendants continue to use their services as independent contractors.

94.     Assuming that all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed healthcare professionals to submit maximum charges of: (i) $106.47 for each sensory nerve in any limb on which an NCV is performed; (ii) $166.47 for each motor nerve in any limb on which an NCV is performed; and (iii) $119.99 for each H-Reflex test that is performed on the nerves of any limb. The EDX Testing Defendants routinely purport to test far more nerves than recommended by the Recommended Policy so as to  maximize the fraudulent charges that can be submitted to Allstate and other insurers.

95.     According to the Fee Schedule, F-wave studies are to be included in the billing for motor nerve NCVs, and are not to be billed separately at an independent rate. Specifically, the Fee Schedule provides that billing code 95903 should be used in cases where a motor nerve NCV includes an F-wave study on the same nerve. In such instances, the Fee Schedule permits lawfully licensed healthcare professionals to bill the maximum amount, $166.47, for each motor

32

nerve NCV. By contrast, billing code 95900 should be used in instances where a motor nerve NCV does not include an F-wave study on the relevant nerve. In that case, the Fee Schedule permits lawfully licensed healthcare professionals to bill a lesser amount – $106.47 – for each motor nerve NCV. The Recommended Policy states, in pertinent part, that:

> CPT codes 95903 and 95900 may appropriately be billed together for the same patient on the same day of service when multiple nerves are tested, some with and some without F waves, because in that case they describe 2 distinct and independent services provided on the same day. However, CPT codes 95903 and 95900 cannot be billed together for the same nerve in a given patient on a given day.

96.     Nonetheless, the Clinic Defendants – in order to maximize their fraudulent billing – often double-bill for F-wave studies, in contravention of the Recommended Policy. The Clinic Defendants employ two different fraudulent approaches when double-billing for F-wave studies. Specifically, the Clinic Defendants either: (i) bill Allstate under billing code 95900 for a motor nerve NCV that does not include an F-wave study, then bill Allstate a second time under billing code 95903 for a motor nerve NCV – on the same nerve, on the same day – that does include an F-wave study; or (ii) bill Allstate under billing code 95903 for a motor nerve NCV that includes an F-wave study, then bill Allstate a second time for F-wave studies on the same nerves using billing code 95934 – the code that is used for H-reflex studies, not F-wave studies. For instance:

> (i)     On September 21, 2006, Neomy billed Allstate $1,331.68 under billing code 95903 for NCVs – including F-wave studies – on eight motor nerves on a patient named Patient "8" (Identity Redacted). Nonetheless, Neomy simultaneously double-billed Allstate an additional $719.94 under billing code 95934 for F-wave studies carried out on six of the same motor nerves, on the same date.
>
> (ii)    On September 25, 2006, Neomy billed Allstate $998.76 under billing code 95903 for NCVs – including F-wave studies – on six motor nerves on a patient named Patient "9" (Identity Redacted). Even so, Neomy simultaneously double-billed Allstate an additional $719.94 under billing

code 95934 for F-wave studies carried out on the same six motor nerves, on the same date.

(iii)   On June 18, 2007, Arco billed Allstate $1,331.68 under billing code 95903 for NCVs – including F-wave studies – on eight motor nerves on a patient named Patient "10" (Identity Redacted). Even so, Arco simultaneously double-billed Allstate an additional $959.92 under billing code 95934 for F-wave studies carried out on the same eight motor nerves, on the same date.

(iv)   On July 6, 2007, Arco billed Allstate $1,331.68 under billing code 95903 for NCVs – including F-wave studies – on eight motor nerves on a patient named Patient "11" (Identity Redacted). Even so, Arco simultaneously double-billed Allstate an additional $959.92 under billing code 95934 for F-wave studies carried out on the same eight motor nerves, on the same date.

(v)   On July 6, 2007, Arco billed Allstate $665.84 under billing code 95903 for NCVs – including F-wave studies – on four motor nerves on a patient named Patient "12" (Identity Redacted). Even so, Arco simultaneously double-billed Allstate an additional $479.36 under billing code 95934 for F-wave studies carried out on the same four motor nerves, on the same date.

(vi)   On July 6, 2007, Arco billed Allstate $665.84 under billing code 95903 for NCVs – including F-wave studies – on four motor nerves on a patient named Patient "13" (Identity Redacted). Even so, Arco simultaneously double-billed Allstate an additional $479.36 under billing code 95934 for F-wave studies carried out on the same four motor nerves, on the same date.

(vii)   On September 6, 2007, Arco billed Allstate $1,331.68 under billing code 95903 for NCVs – including F-wave studies – on eight motor nerves on a patient named Patient "14" (Identity Redacted). Even so, Arco simultaneously double-billed Allstate an additional $959.92 under billing code 95934 for F-wave studies carried out on the same eight motor nerves, on the same date.

(viii)   On October 23, 2007, JDMC billed Allstate $1,331.76 under billing code 95903 for NCVs – including F-wave studies – on eight motor nerves on a patient named Patient "15" (Identity Redacted). Even so, JDMC simultaneously double-billed Allstate an additional $851.76 under billing code 95900 for NCVs carried out on the same date, on the same eight motor nerves, that did not include F-wave studies.

(ix)    On October 23, 2007, JDMC billed Allstate $1,331.76 under billing code 95903 for NCVs – including F-wave studies – on eight motor nerves on a patient named Patient "16" (Identity Redacted). Even so, JDMC simultaneously double-billed Allstate an additional $851.76 under billing code 95900 for NCVs carried out on the same date, on the same eight motor nerves, that did not include F-wave studies.

(x)     On November 15, 2007, JDMC billed Allstate $1,331.76 under billing code 95903 for NCVs – including F-wave studies – on eight motor nerves on a patient named Patient "17" (Identity Redacted). Even so, JDMC simultaneously double-billed Allstate an additional $851.76 under billing code 95900 for NCVs carried out on the same date, on the same eight motor nerves, that did not include F-wave studies.

(xi)    On November 15, 2007, JDMC billed Allstate $1,331.76 under billing code 95903 for NCVs – including F-wave studies – on eight motor nerves on a patient named Patient "18" (Identity Redacted). Even so, JDMC simultaneously double-billed Allstate an additional $851.76 under billing code 95900 for NCVs carried out on the same date, on the same eight motor nerves, that did not include F-wave studies.

(xii)   On March 28, 2008, JMP billed Allstate $665.88 under billing code 95903 for NCVs – including F-wave studies – on four motor nerves on a patient named Patient "19" (Identity Redacted). Even so, JMP simultaneously double-billed Allstate an additional $425.88 under billing code 95900 for F-wave studies carried out on the same four motor nerves, on the same date.

97.     In addition, the values and waveforms contained in the NCV reports that have been attested to by the EDX Testing Defendants and submitted to Allstate through the Clinic Defendants in support of their billing could not possibly be valid. NCV test results are contained in reports that display numeric values for each category of nerve measurements that are taken during an NCV test – i.e., conduction velocity, amplitude, latency, etc. The NCV reports also contain graphic waveforms, from which the numeric values for each category of nerve measurements are derived. Each waveform and numeric value is specific to a given nerve's electrical characteristics at the moment the measurement is taken.

98.     Each waveform is unique. Even if the same nerve, on the same person, was retested moments later, the resulting waveforms and data would be somewhat different. In order for the waveforms and data from two different NCV studies to be identical, the electrical currents measured at the recording electrodes affixed to each different patient would have to be identical to the microsecond for the entire duration of the test. It is impossible for this to occur even a single time. Therefore, the set of values and waveforms for each nerve values that are reported in NCV reports represent the unique "fingerprints" of an Insured's nerves under specific conditions at a specific moment in time.

99.     To further defraud Allstate, the EDX Testing Defendants and Clinic Defendants routinely create and submit NCV reports containing waveforms and numerical data that are duplicated across several patients. Essentially, the EDX Testing Defendants and Clinic Defendants fabricate phony NCV test results that they create simply by copying the data from a pre-existing NCV report, then pasting it into NCV reports created for new patients. Then, they bill Allstate for these fabricated, phony NCV reports. Defendants send these reports to Allstate as: (i) evidence that they performed the tests; and (ii) a representation of the Insureds' medical conditions. Accordingly, each report misrepresents, among other things: (i) that the transmitted NCV test results display the results of the Insureds' tests; and (ii) that the purported findings are true representations of the Insureds' respective conditions.

100.     Allstate commissioned a review of the EDX Testing Defendants' and Clinic Defendants' NCV submissions by Randall L. Braddom, M.D., M.S., ("Dr. Braddom"), an expert on electrodiagnostic testing (the "Braddom NCV Report," annexed hereto as Exhibit "15"). Dr. Braddom determined that, in support of their billing, the EDX Testing Defendants and Clinic Defendants repeatedly submit identical NCV waveforms and data for different patients, a

medical impossibility that conclusively demonstrates fraud. For example, the Braddom Report

identified the following Match Groups:

(i)    <u>Match Group One</u> – Dr. Kim purportedly performed NCVs on a patient named Patient "20" (Identity Redacted) at JDMC on November 14, 2007, a patient named Patient "21" (Identity Redacted) at Arco on February 1, 2008, and a patient named Patient "22" (Identity Redacted) at VE on March 11, 2008 (hereinafter "Match Group One"). After reviewing the NCV reports that JDMC, Arco, and VE submitted in support of their billing, Dr. Braddom determined that: (a) there was complete duplication of motor and sensory nerve NCV data in all three patients' upper limbs; (b) there was complete duplication of the waveforms in all three patients' upper limbs; and (c) there actually was an identical typographical error in the NCV reports for Patient "21" and Patient "22", inasmuch as both reports contained two left ulnar motor nerve studies and no right ulnar motor nerve studies.

(ii)    <u>Match Group Two</u> – Dr. Kim purportedly performed NCVs on a patient named Patient "23" (Identity Redacted) at VE on June 7, 2007, and on a patient named Patient "24" (Identity Redacted) at VE on October 11, 2007. Then, Dr. Tsirlin purportedly performed NCVs on a patient named Patient "25" (Identity Redacted) at JMP on January 31, 2008. After reviewing the NCV reports that VE and JMP submitted in support of their billing, Dr. Braddom determined that: (a) there was complete duplication of motor and sensory nerve NCV data in all three patients' upper limbs; and (b) there was complete duplication of the waveforms in all three patients' upper limbs.

(iii)    <u>Match Group Three</u> – Dr. Tsirlin purportedly performed NCVs on a patient named Patient "26" (Identity Redacted) at JMP on December 20, 2007, and on a patient named Patient "27" (Identity Redacted) at JMP on March 6, 2008. After reviewing the NCV reports that JMP submitted in support of its billing, Dr. Braddom determined that: (a) there was complete duplication of motor and sensory nerve NCV data in both patients' upper limbs; and (b) there was complete duplication of the waveforms in both patients' upper limbs.

(iv)    <u>Match Group Four</u> – Dr. Kim purportedly performed NCVs on a patient named Patient "28" (Identity Redacted) at VE on October 19, 2006, a patient named Patient "29" (Identity Redacted) at Arco on July 20, 2007, a patient named Patient "30" (Identity Redacted) at MP on February 7, 2008, and on a patient named Patient "31" (Identity Redacted) at VE on April 22, 2008. After reviewing the NCV reports that VE, Arco, and MP submitted in support of their billing, Dr. Braddom determined that: (a)

there was complete duplication of motor and sensory nerve NCV data in all four patients' upper limbs; and (b) there was complete duplication of the waveforms in all four patients' upper limbs.

(v) <u>Match Group Five</u> – Dr. Morr purportedly performed NCVs on a patient named Patient "32" (Identity Redacted) at JDMC on January 29, 2007. Then, Dr. Tsirlin purportedly performed NCVs on a patient named Patient "33" (Identity Redacted) at JMP on November 1, 2007. After reviewing the NCV reports that JDMC and JMP submitted in support of their billing, Dr. Braddom determined that there was complete duplication in both patients' left radial sensory NCV data.

101.   Not only did Dr. Braddom identify duplicated NCV reports <u>within</u> the various Match Groups, he also determined that certain data were duplicated <u>across</u> several Match Groups. For instance:

(i) The NCV reports submitted for every patient in Match Group One, Match Group Two, and Match Group Three contained completely identical upper limb sensory NCV data and waveforms.

(ii) The NCV reports submitted for every patient in Match Group Five contained left radial sensory NCV data and waveforms that were completely identical to those of the patients in Match Group One, Match Group Two, and Match Group Three.

(iii) The NCV reports for Match Group One and Match Group Two contained identical motor NCV data, as well, but for nerves from opposite sides of the patients' bodies. For example, the right meridian, left ulnar, and right ulnar motor nerve data for Patient "20" (Identity Redacted) (a patient in Match Group One) were identical to the respective left meridian, right ulnar, and left ulnar motor nerve data for Patient "23" (Identity Redacted) (a patient in Match Group Two).

102.   In addition, Dr. Braddom identified numerous other examples which demonstrate that the EDX Testing Defendants and Clinic Defendants regularly construct fraudulent NCV reports by cutting and pasting data from pre-existing NCVs. (Charts identifying matching NCV report data submitted by the Clinic Defendants and EDX Testing Defendants are annexed hereto as Exhibits "16" through "21"). For example:

(i)     An Insured named Patient "34" (Identity Redacted) purportedly received an NCV on October 29, 2007 at a clinic called Doctor Richard Medical, P.C., which was billed to Allstate. The data and waveforms contained in Patient "34's" report are exact matches for data and waveforms in hundreds of NCV reports prepared by the EDX Testing Defendants and submitted to Allstate by the Clinic Defendants, as well as other professional corporations.

(ii)    An Insured named Patient "1" (Identity Redacted) purportedly received an NCV on October 29, 2007 at VE, which was billed to Allstate. The data and waveforms contained in Patient "1's" NCV report are exact matches for data and waveforms in hundreds of NCV reports prepared by the EDX Testing Defendants and submitted to Allstate by the Clinic Defendants, as well as other professional corporations.

(iii)   An Insured named Patient "35" (Identity Redacted) purportedly received an NCV on October 1, 2008 at a clinic called South Bronx Medical, P.C., which was billed to Allstate. The data and waveforms contained in Patient "35's" NCV report are exact matches for data and waveforms in hundreds of NCV reports prepared by Dr. Kim and Dr. Tsirlin and submitted to Allstate by the Clinic Defendants, as well as other professional corporations.

103.    Clearly, the Clinic Defendants and EDX Testing Defendants draw from a "stock" of NCV data and waveform images that they randomly assemble and combine with the Insureds' claim information to create the impression that the NCV reports represent valid test results.

104.    In one particularly brazen example that illustrates how the Clinic Defendants and EDX Testing Defendants simply create NCV reports out of whole cloth, Dr. Kim purported to perform EDX Tests on an Insured named Patient "36" (Identity Redacted) at MP on September 20, 2007. Though Patient "36's" right leg had been amputated as the result of a childhood accident, Dr. Kim nonetheless claimed to have performed NCVs and EMGs on Patient "36's" right leg – which were billed to Allstate through MP.

### 3.    The Fraudulent EMGs

105.    EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The sound and appearance of the electrical activity in each muscle are compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

106.    There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

107.    The EDX Testing Defendants do not tailor the performance of EMGs to the unique circumstances of each patient. Instead, they routinely test the same muscles in the same limbs over and over again, without regard for individual patient presentment.

108.    Furthermore, even if there were any need for any of these EMGs, the nature and number of the EMGs that the EDX Testing Defendants generally perform grossly exceed the maximum number of such tests – i.e., EMGs of two limbs – that should be necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy. Typically, the EDX Testing Defendants conduct EMGs on four limbs, in contravention of the Recommended Policy.

109.    The EDX Testing Defendants' cookie-cutter approach to the EMGs that they perform on virtually every Insured clearly is not tailored to the unique circumstances of any

Insured and is not based upon medical necessity. Rather, the EDX Testing Defendants' cookie-cutter approach to the EMGs is designed solely to maximize the charges that the Clinic Defendants can submit to Allstate and other insurers. More specifically, if all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed healthcare professionals to submit maximum EMG charges of: (i) $185.73 if an EMG is performed on at least five muscles of one limb; (ii) $241.50 if an EMG is performed on at least five muscles in each of two limbs; (iii) $314.34 if an EMG is performed on at least five muscles in each of three limbs; and (iv) $408.64 if an EMG is performed on at least five muscles in each of four limbs. The EDX Testing Defendants perform EMGs on muscles in all four limbs for the vast majority of Insureds solely to maximize the profits that the Clinic Defendants can reap from each such Insured, and to ensure that the Clinic Defendants continue to use their services as independent contractors.

110.    Furthermore, the charges submitted through the Clinic Defendants frequently are "unbundled." This is done by submitting two separate charges of $241.50 for the EMGs performed on the muscles in both arms and $241.50 for the EMGs performed on the muscles in both legs. These two separate charges total $483.00. Separate charges are submitted because, as described above, under the Fee Schedule, the maximum charge for EMGs performed on the muscles in all four limbs is $408.64. This is the maximum charge to which the Clinic Defendants would be entitled if the EMGs were medically necessary, which they are not, and all other conditions of coverage are satisfied. Thus, the "unbundling" of the EMG charges in every instance results in an overcharge of approximately $75.00.

111.    Allstate commissioned a review by Dr. Braddom of approximately 174 EMG submissions made by the EDX Testing Defendants and the Clinic Defendants. Dr. Braddom

concluded that the EMG reports submitted by the EDX Testing Defendants and Clinic Defendants were fraudulent in the following respects:

(i)     The EDX Testing Defendants routinely tested the same groups of muscles in the same limbs over and over again, to an extent that exceeds any statistical likelihood that the individual patients had presented with symptoms that required such identical EMG testing;

(ii)    In a majority of cases, the EDX Testing Defendants conducted incomplete EMGs, which nonetheless were billed to Allstate. In order to submit a charge to Allstate or other insurers, the EDX Testing Defendants were required to test at least five muscles per extremity for each Insured. Even so, the EDX Testing Defendants typically tested only three to four muscles per extremity.

(iii)   Though – given the most liberal interpretation – radiculopathies are present in only 12 percent of motor vehicle accident victims, the EMG Testing Defendants purported to diagnose radiculopathies in more than 50 percent of Insureds. The EDX Testing Defendants arrived at these pre-determined "conclusions" in order to create the appearance of severe injuries and thereby provide support for the laundry-list of medically unnecessary services provided through the Clinic Defendants.

(iv)    Though multiple levels of radiculopathy are present in only approximately 20 percent of cases in which a patient legitimately suffers from radiculopathy, the EDX Testing Defendants purported to discover multiple levels of radiculopathy in virtually every Insured who received a radiculopathy diagnosis. Again, the EMG Testing Defendants arrived at these pre-determined "conclusions" in order to create the appearance of severe injuries and thereby provide support for the laundry-list of medically unnecessary services provided through the Clinic Defendants.

(v)     Furthermore, in diagnosing radiculopathy, electromyographers use changes in muscle electrical activity observed on EMG needle examinations. Typically, motor unit recruitment in limb muscles is one of the earliest observed changes. Recruitment cannot reasonably be determined in the paraspinal muscles. However, in virtually every EMG that they purported to conduct, the EDX Testing Defendants reported that they read recruitment in the paraspinal muscles.

(vi)    Though 50-80 percent of patients who legitimately suffer from cervical radiculopathy present with a radiculopathy at the C7 root level, not a single one of the cervical radiculopathy "diagnoses" made by the EDX Defendants was identified as a C7 radiculopathy.

(vii)   Though 90 percent of patients who legitimately suffer from lumbosacral radiculopathy present with a radiculopathy at either the L5 or S1 root level, fewer than 25 percent of the EDX Defendants' lumbosacral radiculopathy "diagnoses" identified an L5 or S1 radiculopathy.

112.   Additionally, the EDX Testing Defendants typically perform no genuine, independent analysis of the EMG testing results at all. Instead, they generally wait until after an MRI is performed on a given Insured, then simply correlate their EMG "findings" with those results.

## E.   The Defendants Subjected Minors to Their Fraudulent Treatment Protocol

113.   In many cases, not even the youngest patients were spared the Defendants' fraudulent treatment protocol. Rather, to extract the maximum possible billing from each Insured, the Defendants even subjected minors to their full range of medically unnecessary "treatments."

114.   Because the Defendants' cookie-cutter approach to medical care was uniform for virtually every patient, it placed virtually every patient at risk of going untreated in the event that the patient actually presented with a genuine medical problem. Likewise, since in many cases the EDX Defendants simply cobbled together EDX Test reports using preexisting data from other patients, it placed patients at risk of going untreated in the event that the patient actually presented with a genuine medical problem. Because the Defendants applied their fraudulent treatment protocol to minors as well as adults, they placed minors at serious risk. For instance:

(i)   Over the course of several months in 2007, Dr. Etienne and Dr. Kim subjected a 16 year-old girl named Patient "37" (Identity Redacted) to the full fraudulent treatment protocol at VE, without regard for any actual medical problems that she may have had. Notably, the NCV report that Dr. Kim prepared for Patient "37" contained data that was an exact match to data that appeared in other NCV reports for other patients, a medical

impossibility which indicates that Dr. Kim never performed the NCV at all.

(ii)     Over the course of several months in 2007, Dr. Etienne and Dr. Kim subjected a 17 year-old boy named Patient "20" (Identity Redacted) to the full fraudulent treatment protocol at JDMC, without regard for any actual medical problems that he may have had. As noted, above, the NCV report that Dr. Kim prepared for Patient "20" contained data that was an exact match to data that appeared in other NCV reports for other patients, a medical impossibility which indicates that Dr. Kim never performed the NCV at all.

(iii)    Over the course of several months in late 2007 – early 2008, Dr. Geris and Dr. Tsirlin subjected a 15 year-old boy named Patient "38" (Identity Redacted) to the full fraudulent treatment protocol at JMP. As noted, above, the NCV report that Dr. Tsirlin prepared for Patient "38" contained data that was an exact match to data that appeared in other NCV reports for other patients, a medical impossibility which indicates that Dr. Kim never performed the NCV at all.

(iv)    Over the course of several months in 2006, Dr. Davidov and Dr. Tsirlin subjected a 17 year-old boy named Patient "39" (Identity Redacted) to the full fraudulent treatment protocol at S&R. The NCV report that Dr. Tsirlin prepared for Patient "39" contained data that was an exact match to data that appeared in other NCV reports for other patients, a medical impossibility which indicates that Dr. Tsirlin never performed the NCV at all.

## IV.    The Defendants' Fraudulent Concealment and Allstate's Justifiable Reliance

115.    The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the performance of the Fraudulent Services and their submission of charges to Allstate.

116.    To induce Allstate to promptly pay the charges for the Fraudulent Services, the Defendants have gone to great lengths to systematically conceal their fraud. For instance, they have knowingly misrepresented and concealed facts related to the employment status of the physicians associated with the PC Defendants in order to prevent Allstate from discovering that the physicians performing the Consultations and EDX Testing are not employed by the PC

Defendants. In addition, they knowingly have misrepresented and concealed facts in order to prevent Allstate from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to a fraudulent pre-determined protocol designed to maximize the charges that could be submitted. Furthermore, the Defendants in many cases have created multiple professional corporations with different tax identification numbers in order to reduce the amount of billing submitted through any single professional corporation, thereby preventing Allstate from identifying the pattern of fraudulent charges submitted through any one entity.

117.    The Defendants have hired law firms to pursue collection of the fraudulent charges from Allstate and other insurers. These law firms routinely file expensive and time-consuming litigation against Allstate and other insurers if the charges are not promptly paid in full.

118.    Allstate is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to Allstate in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did cause Allstate to rely upon them. As a result, Allstate has incurred damages of more than One Million, Seven Hundred Eighty Thousand ($1,780,000.00) Dollars based upon the fraudulent charges.

119.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Allstate, Allstate did not discover, and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this complaint.

## FIRST CAUSE OF ACTION AGAINST THE PC DEFENDANTS
### (Declaratory Relief Under 28 U.S.C. § 2201)

120.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 119 above.

121.    There is an actual case in controversy between Allstate and the PC Defendants as to all professional charges, including charges for the Examinations, ROM/Muscle Tests, Consultations, and EDX Tests that have not been paid.

122.    In each and every claim submitted to Allstate, the PC Defendants knowingly made one or more of the following material misrepresentations: (i) that the Fraudulent Services were rendered by the PC Defendants' "employees", when in fact the providing physicians frequently were independent contractors; and/or (ii) that the Fraudulent Services were medically necessary, when in fact they were not medically necessary and frequently never were provided at all.

123.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

> (i)     the PC Defendants have no right to receive payment for any pending bills submitted to Allstate because the Fraudulent Services were provided by independent contractors; and

> (ii)    the PC Defendants have no right to receive payment for any pending bills submitted to Allstate because the Fraudulent Services were not medically necessary or were not provided at all.

## SECOND CAUSE OF ACTION
## AGAINST DR. ETIENNE, VE, VEMC, JDMC, DR. KIM, AND DR. MORR
### (Violation of 18 U.S.C. § 1962(c))

124.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 123 above.

46

125.    Dr. Etienne, VE, VEMC, JDMC, Dr. Kim, and Dr. Morr ("the Etienne Fraudulent Testing Enterprise") constitute an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce. The members of the Etienne Fraudulent Testing Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Dr. Etienne is the physician who incorporated VE, VEMC and JDMC, purports to act as the sole shareholder, director and officer of the professional corporations and oversee the operations on a day-to-day basis, and purports to perform and issue reports based upon many of the fraudulent medical services, including the Examinations and ROM/Muscle Tests. VE, VEMC and JDMC ostensibly are independent entities – with different names and tax identification numbers – that were created as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to Allstate. The Etienne Fraudulent Testing Enterprise has been operated under three separate corporate names in order to reduce the number of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of Allstate and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one company. Dr. Kim and Dr. Morr falsely purport to be employees of VE, VEMC and JDMC; purport to perform the Consultations and EDX Tests; and issue false reports relating to the Consultations and EDX Tests to support the fraudulent charges, in order to permit VE, VEMC and JDMC to bill for and collect No-Fault Benefits to which they are not entitled. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Etienne Fraudulent Testing Enterprise acting singly or without the aid of each other.

126. The Etienne Fraudulent Testing Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to Allstate and other insurers), by creating and maintaining patient files and other records resulting from the performance of the Fraudulent Services, by recruiting and supervising personnel, by negotiating and executing various billing and collection agreements, facility lease agreements, equipment lease agreements and management agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

127. Dr. Etienne, VE, VEMC, JDMC, Dr. Kim, and Dr. Morr each was employed by and/or associated with the Etienne Fraudulent Testing Enterprise.

128. Dr. Etienne, VE, VEMC, JDMC, Dr. Kim, and Dr. Morr knowingly conducted and/or participated, directly and/or indirectly, in the conduct of the Etienne Fraudulent Testing Enterprise through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis over more than six (6) years. Furthermore, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as the Etienne Fraudulent Testing Enterprise continues to submit and attempt collection on fraudulent billing to the present day.

These acts of mail fraud include, but are not limited to, those that are described in the chart annexed hereto as Exhibit "1".

129.     Each of these predicate acts of mail fraud constituted an inherently unlawful act committed at the behest of the Etienne Fraudulent Testing Enterprise, an organization whose business is racketeering activity. These predicate acts of mail fraud were the regular way in which the Defendants operated the Etienne Fraudulent Testing Enterprise, inasmuch as VE, VEMC, and JDMC never were eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the Etienne Fraudulent Testing Enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity.

130.     The Defendants continue to attempt collection on the fraudulent billing.

131.     Allstate has been injured in its business and property by reason of the above conduct in that it has paid more than Six Hundred and Forty-Eight Thousand ($648,000.00) Dollars pursuant to the fraudulent bills submitted through VE, VEMC, and JDMC.

132.     By reason of its injury, Allstate is entitled to treble damages, costs and reasonable attorney's fees pursuant to 18 U.S.C. Section 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
### AGAINST DR. ETIENNE, VE, VEMC, JDMC, DR. KIM, AND DR. MORR
(Violation of 18 U.S.C. § 1962(d))

133.     Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 132 above.

134.     All of the members of the Etienne Fraudulent Testing Enterprise knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the

conduct of the Etienne Fraudulent Testing Enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit hundreds of fraudulent bills to Allstate. These acts of mail fraud include, but are not limited to, those that are described in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

135. Each member of the Etienne Fraudulent Testing Enterprise knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud Allstate and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Allstate.

136. Allstate has been injured in its business and property by reason of the above conduct in that it has paid more than Six Hundred and Forty-Eight Thousand ($648,000.00) Dollars pursuant to the fraudulent bills submitted through VE, VEMC, and JDMC.

137. By reason of its injury, Allstate is entitled to treble damages, costs and reasonable attorney's fees pursuant to 18 U.S.C. Section 1964(c), and any other relief the Court deems just and proper.


### FOURTH CAUSE OF ACTION
### AGAINST DR. ETIENNE, VE, VEMC, JDMC, DR. KIM, AND DR. MORR
(Common Law Fraud)

138. Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 137 above.

139. The Defendants intentionally and knowingly made false and fraudulent statements of material fact to Allstate by submitting, or causing to be submitted, hundreds of fraudulent bills

that included charges for the medically unnecessary Examinations, ROM/Muscle Tests, Consultations, and EDX Tests.

140.    These false and fraudulent statements of material fact include the representations in every claim that VE, VEMC and/or JDMC were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11(a) for the services that allegedly were performed, when in fact they were not eligible to seek or pursue collection of No-Fault Benefits associated with the services because the services were not provided by their employees.

141.    In addition, these false and fraudulent statements of material fact include the representations in every claim submitted or caused to be submitted by or through Dr. Etienne, VE, VEMC, JDMC, Dr. Kim and/or Dr. Morr that the Fraudulent Services were medically necessary when, in fact, they were not. Indeed, Dr. Etienne, VE, VEMC, JDMC, Dr. Kim and Dr. Morr all knew that the Fraudulent Services were ordered and performed pursuant to pre-determined fraudulent protocols designed solely to facilitate charges from VE, VEMC and/or JDMC, and to support the laundry list of medically unnecessary services purportedly rendered to Insureds by or at the direction of the Defendants.

142.    The Defendants made false and fraudulent statements and concealed material facts in a calculated effort to induce Allstate to pay charges submitted by Defendants that were not compensable under the No-Fault Laws.

143.    Allstate justifiably relied on the Defendants' false and fraudulent representations, and as a proximate result have incurred damages of more than Six Hundred and Forty-Eight Thousand ($648,000.00) Dollars based upon the fraudulent charges.

144.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

145.     Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### AGAINST DR. ETIENNE, VE, VEMC, JDMC, DR. KIM, AND DR. MORR
(Unjust Enrichment)

146.     Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 145 above.

147.     As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Allstate.

148.     When Allstate paid the bills and charges submitted by or on behalf of VE, VEMC and JDMC for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

149.     Defendants have been enriched at Allstate's expense by Allstate's payments which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

150.     Defendants' retention of Allstate's payments violates fundamental principles of justice, equity and good conscience.

151.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of Six Hundred and Forty-Eight Thousand ($648,000.00) Dollars.

## SIXTH CAUSE OF ACTION
## AGAINST DR. KIM AND DR. MORR
(Aiding and Abetting)

152.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 151 above.

153.    Dr. Kim and Dr. Morr knowingly aided and abetted the fraudulent scheme that was perpetrated on Allstate by Dr. Etienne, VE, VEMC and JDMC.  The acts of Dr. Kim and Dr. Morr in furtherance of the fraudulent scheme include: (i) knowingly conducting medically unnecessary Consultations in exchange for payment of money; and (ii) knowingly recommending and performing medically unnecessary EDX Tests and issuing fraudulent reports in exchange for payment of money from Dr. Etienne, VE, VEMC and JDMC.

154.    The conduct of Dr. Kim and Dr. Morr in furtherance of the fraudulent scheme is significant and material. The conduct of Dr. Kim and Dr. Morr is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, including the performance of the fraudulent Consultations, the recommendations for and performance of the fraudulent EDX Tests and the issuance of the fraudulent EDX Testing reports, there would be no opportunity for Dr. Etienne, VE, VEMC and JDMC to obtain payment from Allstate and from other insurers.

155.    Dr. Kim and Dr. Morr aided and abetted the fraudulent scheme in a calculated effort to induce Allstate into paying charges to VE, VEMC and JDMC for medically unnecessary services that were not compensable under New York's No-Fault Laws, because they sought to continue profiting through the fraudulent scheme.

156.    The conduct of Dr. Kim and Dr. Morr caused Allstate to pay more than Six Hundred and Forty-Eight Thousand ($648,000.00) Dollars based upon the fraudulent charges submitted through VE, VEMC, and JDMC.

157.    Dr. Kim and Dr. Morr's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

158.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
## AGAINST DR. SHEVETZ, SEBASTIAN, ACUTE AND DR. KIM
### (Violation of 18 U.S.C. § 1962(c))

159.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 158 above.

160.    Dr. Shevetz, Sebastian, Acute, and Dr. Kim ("the Shevetz Fraudulent Testing Enterprise") constitute an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce. The members of the Shevetz Fraudulent Testing Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Dr. Shevetz is the physician who incorporated Sebastian and Acute, purports to act as the sole shareholder, director and officer of the professional corporations and oversee the operations on a day-to-day basis, and purports to perform many of the fraudulent medical services and issue reports, including the Examinations and ROM/Muscle Tests. Sebastian and Acute ostensibly are independent entities – with different names and tax

54

identification numbers – that were created as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to Allstate.  The Shevetz Fraudulent Testing Enterprise has been operated under two separate corporate names in order to reduce the number of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of Allstate and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one company.  Dr. Kim falsely purports to be an employee of Sebastian and Acute; purports to perform the Consultations and EDX Tests; and issues false reports relating to the Consultations and EDX Tests to support the fraudulent charges, in order to permit Sebastian and Acute to bill for and collect No-Fault Benefits to which they are not entitled.  Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Shevetz Fraudulent Testing Enterprise acting singly or without the aid of each other.

161.   The Shevetz Fraudulent Testing Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to Allstate and other insurers), by creating and maintaining patient files and other records resulting from the performance of the Fraudulent Services, by recruiting and supervising personnel, by negotiating and executing various billing and collection agreements, facility lease agreements, equipment lease agreements and management agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds and by

retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

162.   Dr. Shevetz, Sebastian, Acute, and Dr. Kim each was employed by and/or associated with the Shevetz Fraudulent Testing Enterprise.

163.   Dr. Shevetz, Sebastian, Acute, and Dr. Kim knowingly conducted and/or participated, directly and/or indirectly, in the conduct of the Shevetz Fraudulent Testing Enterprise through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. §1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis over more than three (3) years. Furthermore, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as the Shevetz Fraudulent Testing Enterprise continues to submit and attempt collection on fraudulent billing to the present day. A representative sample of the acts of mail fraud include, but are not limited to, those that are described in the chart annexed hereto as Exhibit "2".

164.   Each of these predicate acts of mail fraud constituted an inherently unlawful act committed at the behest of the Shevetz Fraudulent Testing Enterprise, an organization whose business is racketeering activity. These predicate acts of mail fraud were the regular way in which the Defendants operated the Shevetz Fraudulent Testing Enterprise, inasmuch as Sebastian and Acute never were eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the Shevetz Fraudulent Testing Enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity.

165.   The Defendants continue to attempt collection on the fraudulent billing.

56

166.    Allstate has been injured in its business and property by reason of the above conduct in that it has paid more than One Hundred and Twenty-Five Thousand ($125,000.00) Dollars pursuant to the fraudulent bills submitted through Sebastian and Acute.

167.    By reason of its injury, Allstate is entitled to treble damages, costs and reasonable attorney's fees pursuant to 18 U.S.C. Section 1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
## AGAINST DR. SHEVETZ, SEBASTIAN, ACUTE AND DR. KIM
### (Violation of 18 U.S.C. § 1962(d))

168.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 167 above.

169.    All of the members of the Shevetz Fraudulent Testing Enterprise knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Shevetz Fraudulent Testing Enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit hundreds of fraudulent bills to Allstate. These acts of mail fraud include, but are not limited to, those that are described in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

170.    Each member of the Shevetz Fraudulent Testing Enterprise knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud Allstate and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Allstate.

171.    Allstate has been injured in its business and property by reason of the above conduct in that it has paid more than One Hundred Twenty-Five Thousand ($125,000.00) Dollars pursuant to the fraudulent bills submitted through Sebastian and Acute.

172.    By reason of its injury, Allstate is entitled to treble damages, costs and reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
## AGAINST DR. SHEVETZ, SEBASTIAN, ACUTE AND DR. KIM
(Common Law Fraud)

173.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 172 above.

174.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to Allstate by submitting, or causing to be submitted, hundreds of fraudulent bills that included charges for the medically unnecessary Examinations, ROM/Muscle Tests, Consultations, and EDX Tests.

175.    These false and fraudulent statements of material fact include the representations in every claim that Sebastian and Acute were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11(a) for the services that allegedly were performed when in fact they were not eligible to seek or pursue collection of No-Fault Benefits associated with the services because the services were not provided by their employees.

176.    In addition, these false and fraudulent statements of material fact include the representations in every claim submitted or caused to be submitted by or through Dr. Shevetz, Sebastian, Acute and Dr. Kim that the Fraudulent Services were medically necessary when, in

58

fact, they were not. Indeed, the Defendants knew that the Fraudulent Services were ordered and performed pursuant to pre-determined fraudulent protocols designed solely to facilitate charges from Sebastian and Acute, and to support the laundry list of medically unnecessary services purportedly rendered to Insureds by or at the direction of the Defendants.

177.    The Defendants made false and fraudulent statements and concealed material facts in a calculated effort to induce Allstate to pay charges submitted by Defendants that were not compensable under the No-Fault Laws.

178.    Allstate justifiably relied on the Defendants' false and fraudulent representations, and as a proximate result have incurred damages of more than One Hundred Twenty-Five Thousand ($125,000.00) Dollars based upon the fraudulent charges.

179.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

180.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TENTH CAUSE OF ACTION
## AGAINST DR. SHEVETZ, SEBASTIAN, ACUTE AND DR. KIM
(Unjust Enrichment)

181.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 180 above.

182.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Allstate.

183.    When Allstate paid the bills and charges submitted by or on behalf of Sebastian and Acute for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

184.    Defendants have been enriched at Allstate's expense by Allstate's payments which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

185.    Defendants' retention of Allstate's payments violates fundamental principles of justice, equity and good conscience.

186.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of One Hundred Twenty Five Thousand ($125,000.00) Dollars.

## ELEVENTH CAUSE OF ACTION AGAINST DR. KIM
### (Aiding and Abetting)

187.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 186 above.

188.    Dr. Kim knowingly aided and abetted the fraudulent scheme that was perpetrated on Allstate by Dr. Shevetz, Sebastian and Acute.  The acts of Dr. Kim in furtherance of the fraudulent scheme include: (i) knowingly conducting medically unnecessary Consultations in exchange for payment of money; and (ii) knowingly recommending and performing medically unnecessary EDX Tests and issuing fraudulent reports in exchange for payment of money from Dr. Shevetz, Sebastian and Acute

189.    The conduct of Dr. Kim in furtherance of the fraudulent scheme is significant and material. The conduct of Dr. Kim is a necessary part of and is critical to the success of the

fraudulent scheme because without his actions, including the performance of the fraudulent Consultations, the recommendations for and performance of the fraudulent EDX Tests, and the issuance of the fraudulent EDX Testing reports, there would be no opportunity for Dr. Shevetz, Sebastian and Acute to obtain payment from Allstate and from other insurers.

190.    Dr. Kim aided and abetted the fraudulent scheme in a calculated effort to induce Allstate into paying charges to Sebastian and Acute for medically unnecessary services that were not compensable under New York's No-Fault Laws, because he sought to continue profiting through the fraudulent scheme.

191.    The conduct of Dr. Kim caused Allstate to pay more than One Hundred Twenty Five Thousand ($125,000.00) Dollars based upon the fraudulent charges submitted through Sebastian and Acute.

192.    Dr. Kim's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

193.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWELFTH CAUSE OF ACTION
### AGAINST DR. BERARDI, ARCO, NEOMY, KATH, DR. KIM, DR. MORR, AND DR. TSIRLIN
(Violation of 18 U.S.C. § 1962(c))

194.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 193 above.

195.    Dr. Berardi, Arco, Neomy, Kath, Dr. Kim, Dr. Morr, and Dr. Tsirlin ("the Berardi Fraudulent Testing Enterprise") constitute an association-in-fact "enterprise" as that term is

defined in 18 U.S.C. §1961(4), that engages in, and the activities of which affect, interstate commerce. The members of the Berardi Fraudulent Testing Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Dr. Berardi is the physician who incorporated Arco, Neomy, and Kath, purports to act as the sole shareholder, director and officer of the professional corporations and oversee the operations on a day-to-day basis, and purports to perform and issue reports based upon many of the fraudulent medical services, including the Examinations and ROM/Muscle Tests. Arco, Neomy, and Kath ostensibly are independent entities – with different names and tax identification numbers – that were created as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to Allstate. The Berardi Fraudulent Testing Enterprise has been operated under three separate corporate names in order to reduce the number of bills submitted under any individual name, in, an attempt to avoid attracting the attention and scrutiny of Allstate and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one company. Dr. Kim, Dr. Tsirlin, and Dr. Morr falsely purport to be employees of Arco, Neomy, and Kath; purport to perform the Consultations and EDX Tests; and issue false reports relating to the Consultations and EDX Tests to support the fraudulent charges, in order to permit Arco, Neomy, and Kath to bill for and collect No-Fault Benefits to which they are not entitled. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Berardi Fraudulent Testing Enterprise acting singly or without the aid of each other.

196.    The Berardi Fraudulent Testing Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing

overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to Allstate and other insurers), by creating and maintaining patient files and other records resulting from the performance of the Fraudulent Services, by recruiting and supervising personnel, by negotiating and executing various billing and collection agreements, facility lease agreements, equipment lease agreements and management agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

197.   Dr. Berardi, Arco, Neomy, Kath, Dr. Kim, Dr. Morr, and Dr. Tsirlin each was employed by and/or associated with the Berardi Fraudulent Testing Enterprise.

198.   Dr. Berardi, Arco, Neomy, Kath, Dr. Kim, Dr. Morr, and Dr. Tsirlin knowingly conducted and/or participated, directly and/or indirectly, in the conduct of the Berardi Fraudulent Testing Enterprise through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis over more than three (3) years.  Furthermore, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as the Berardi Fraudulent Testing Enterprise continues to submit and attempt collection on fraudulent billing to the present day. These acts of mail fraud include, but are not limited to, those that are described in the chart annexed hereto as Exhibit "3".

199.    Each of these predicate acts of mail fraud constituted an inherently unlawful act committed at the behest of the Berardi Fraudulent Testing Enterprise, an organization whose business is racketeering activity. These predicate acts of mail fraud were the regular way in which the Defendants operated the Berardi Fraudulent Testing Enterprise, inasmuch as Arco, Neomy, and Kath never were eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the Berardi Fraudulent Testing Enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity.

200.    The Defendants continue to attempt collection on the fraudulent billing.

201.    Allstate has been injured in its business and property by reason of the above conduct in that it has paid more than Four Hundred Sixty-Nine Thousand ($469,000.00) Dollars pursuant to the fraudulent bills submitted through Arco, Neomy, and Kath.

202.    By reason of its injury, Allstate is entitled to treble damages, costs and reasonable attorney's fees pursuant to 18 U.S.C. Section 1964(c), and any other relief the Court deems just and proper.

## THIRTEENTH CAUSE OF ACTION
## AGAINST DR. BERARDI, ARCO, NEOMY, KATH, DR. KIM, DR. MORR, AND DR. TSIRLIN
(Violation of 18 U.S.C. § 1962(d))

203.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 202 above.

204.    All of the members of the Berardi Fraudulent Testing Enterprise knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Berardi Fraudulent Testing Enterprise's affairs, through a pattern of racketeering

activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit hundreds of fraudulent bills to Allstate. These acts of mail fraud include, but are not limited to, those that are described in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

205.    Each member of the Berardi Fraudulent Testing Enterprise knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud Allstate and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Allstate.

206.    Allstate has been injured in its business and property by reason of the above conduct in that it has paid more than Four Hundred Sixty-Nine Thousand ($469,000.00) Dollars pursuant to the fraudulent bills submitted through Arco, Neomy, and Kath.

207.    By reason of its injury, Allstate is entitled to treble damages, costs and reasonable attorney's fees pursuant to 18 U.S.C. Section 1964(c), and any other relief the Court deems just and proper.

### FOURTEENTH CAUSE OF ACTION
**AGAINST DR. BERARDI, ARCO, NEOMY, KATH, DR. KIM, DR. MORR, AND DR. TSIRLIN**
(Common Law Fraud)

208.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 207 above.

209.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to Allstate by submitting, or causing to be submitted, hundreds of fraudulent bills

that included charges for the medically unnecessary Examinations, ROM/Muscle Tests, Consultations, and EDX Tests.

210. These false and fraudulent statements of material fact include the representations in every claim that Arco, Neomy, and/or Kath were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11(a) for the services that allegedly were performed, when in fact they were not eligible to seek or pursue collection of No-Fault Benefits associated with the services because the services were not provided by their employees.

211. In addition, these false and fraudulent statements of material fact include the representations in every claim submitted or caused to be submitted by or through Dr. Berardi, Arco, Neomy, Kath, Dr. Kim, Dr. Tsirlin and/or Dr. Morr that the Fraudulent Services were medically necessary when, in fact, they were not. Indeed, the Defendants knew that the Fraudulent Services were ordered and performed pursuant to pre-determined fraudulent protocols designed solely to facilitate charges from Arco, Neomy, and/or Kath, and to support the laundry list of medically unnecessary services purportedly rendered to Insureds by or at the direction of the Defendants.

212. The Defendants made false and fraudulent statements and concealed material facts in a calculated effort to induce Allstate to pay charges submitted by Defendants that were not compensable under the No-Fault Laws.

213. Allstate justifiably relied on the Defendants' false and fraudulent representations, and as a proximate result have incurred damages of more than Four Hundred Sixty-Nine Thousand ($469,000.00) Dollars based upon the fraudulent charges.

214. The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

215.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTEENTH CAUSE OF ACTION
### AGAINST DR. BERARDI, ARCO, NEOMY, KATH, DR. KIM, DR. MORR, AND DR. TSIRLIN
(Unjust Enrichment)

216.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 215 above.

217.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Allstate.

218.    When Allstate paid the bills and charges submitted by or on behalf of Arco, Neomy, and Kath for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

219.    Defendants have been enriched at Allstate's expense by Allstate's payments which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

220.    Defendants' retention of Allstate's payments violates fundamental principles of justice, equity and good conscience.

221.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of Four Hundred Sixty-Nine Thousand ($469,000.00) Dollars.

## SIXTEENTH CAUSE OF ACTION
## AGAINST DR. KIM, DR. TSIRLIN, AND DR. MORR
(Aiding and Abetting)

222.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 221 above.

223.    Dr. Kim, Dr. Tsirlin, and Dr. Morr knowingly aided and abetted the fraudulent scheme that was perpetrated on Allstate by Dr. Berardi, Arco, Neomy, and Kath. The acts of Dr. Kim, Dr. Tsirlin and Dr. Morr in furtherance of the fraudulent scheme include: (i) knowingly conducting medically unnecessary Consultations in exchange for payment of money; and (ii) knowingly recommending and performing medically unnecessary EDX Tests and issuing fraudulent reports in exchange for payment of money from Dr. Berardi, Arco, Neomy, and Kath.

224.    The conduct of Dr. Kim, Dr. Tsirlin and Dr. Morr in furtherance of the fraudulent scheme is significant and material. The conduct of Dr. Kim, Dr. Tsirlin and Dr. Morr is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, including the performance of the fraudulent Consultations, the recommendations for and performance of the fraudulent EDX Tests and the issuance of the fraudulent EDX Testing reports, there would be no opportunity for Dr. Berardi, Arco, Neomy, and Kath to obtain payment from Allstate and from other insurers.

225.    Dr. Kim, Dr. Tsirlin and Dr. Morr aided and abetted the fraudulent scheme in a calculated effort to induce Allstate into paying charges to Arco, Neomy, and Kath for medically unnecessary services that were not compensable under New York's No-Fault Laws, because they sought to continue profiting through the fraudulent scheme.

226.    The conduct of Dr. Kim, Dr. Tsirlin and Dr. Morr caused Allstate to pay more than Four Hundred Sixty-Nine Thousand ($469,000.00) Dollars based upon the fraudulent charges submitted through the Arco, Neomy, and Kath.

227.    Dr. Kim, Dr. Tsirlin and Dr. Morr's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

228.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTEENTH CAUSE OF ACTION
## AGAINST DR. GERIS, JMP, AND DR. TSIRLIN
### (Violation of 18 U.S.C. § 1962(c))

229.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 228 above.

230.    Dr. Geris, JMP, and Dr. Tsirlin ("the Geris Fraudulent Testing Enterprise") constitute an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce. The members of the Geris Fraudulent Testing Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Dr. Geris is the physician who incorporated JMP, purports to act as the sole shareholder, director and officer of the professional corporation and oversees the operations on a day-to-day basis, and purports to perform and issue reports based upon many of the fraudulent medical services, including the Examinations and ROM/Muscle Tests. JMP was created to

69

facilitate the submission of fraudulent charges to Allstate. Dr. Tsirlin falsely purports to be an employee of JMP; purports to perform the Consultations and EDX Tests; and issues false reports relating to the Consultations and EDX Tests to support the fraudulent charges, in order to permit JMP to bill for and collect No-Fault Benefits to which it is not entitled. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Geris Fraudulent Testing Enterprise acting singly or without the aid of each other.

231.    The Geris Fraudulent Testing Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to Allstate and other insurers), by creating and maintaining patient files and other records resulting from the performance of the Fraudulent Services, by recruiting and supervising personnel, by negotiating and executing various billing and collection agreements, facility lease agreements, equipment lease agreements and management agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

232.    Dr. Geris, JMP, and Dr. Tsirlin each was employed by and/or associated with the Geris Fraudulent Testing Enterprise.

233.    Dr. Geris, JMP, and Dr. Tsirlin knowingly conducted and/or participated, directly and/or indirectly, in the conduct of the Geris Fraudulent Testing Enterprise through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C.

§ 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent bills on a continuous basis over more than one and a half (1.5) years. Furthermore, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as the Geris Fraudulent Testing Enterprise continues to submit and attempt collection on fraudulent billing to the present day. These acts of mail fraud include, but are not limited to, those that are described in the chart annexed hereto as Exhibit "4".

234.    Each of these predicate acts of mail fraud constituted an inherently unlawful act committed at the behest of the Geris Fraudulent Testing Enterprise, an organization whose business is racketeering activity. These predicate acts of mail fraud were the regular way in which the Defendants operated the Geris Fraudulent Testing Enterprise, inasmuch as JMP never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the Geris Fraudulent Testing Enterprise to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity.

235.    The Defendants continue to attempt collection on the fraudulent billing.

236.    Allstate has been injured in its business and property by reason of the above conduct in that it has paid more than Ninety-Three Thousand ($93,000.00) Dollars pursuant to the fraudulent bills submitted through JMP.

237.    By reason of its injury, Allstate is entitled to treble damages, costs and reasonable attorney's fees pursuant to 18 U.S.C. Section 1964(c), and any other relief the Court deems just and proper.

## EIGHTEENTH CAUSE OF ACTION
## AGAINST DR. GERIS, JMP, AND DR. TSIRLIN
(Violation of 18 U.S.C. § 1962(d))

238.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 237 above.

239.    All of the members of the Geris Fraudulent Testing Enterprise knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Geris Fraudulent Testing Enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent bills to Allstate. These acts of mail fraud include, but are not limited to, those that are described in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

240.    Each member of the Geris Fraudulent Testing Enterprise knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud Allstate and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Allstate.

241.    Allstate has been injured in its business and property by reason of the above conduct in that it has paid more than Ninety-Three Thousand ($93,000.00) Dollars pursuant to the fraudulent bills submitted through JMP.

242.    By reason of its injury, Allstate is entitled to treble damages, costs and reasonable attorney's fees pursuant to 18 U.S.C. Section 1964(c), and any other relief the Court deems just and proper.

## NINETEENTH CAUSE OF ACTION
## AGAINST DR. GERIS, JMP, AND DR. TSIRLIN
(Common Law Fraud)

243.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 242 above.

244.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to Allstate by submitting, or causing to be submitted, thousands of fraudulent bills that included charges for the medically unnecessary Examinations, ROM/Muscle Tests, Consultations, and EDX Tests.

245.    These false and fraudulent statements of material fact include the representations in every claim that JMP was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11(a) for the services that were allegedly performed, when in fact it was not eligible to seek or pursue collection of No-Fault Benefits associated with the services because the services were not provided by its employees.

246.    In addition, these false and fraudulent statements of material fact include the representations in every claim submitted or caused to be submitted by or through Dr. Geris, JMP, and/or Dr. Tsirlin that the Fraudulent Services were medically necessary when, in fact, they were not. Indeed, the Defendants knew that the Fraudulent Services were ordered and performed pursuant to pre-determined fraudulent protocols designed solely to facilitate charges from JMP, and to support the laundry list of medically unnecessary services purportedly rendered to Insureds by or at the direction of the Defendants.

247.    The Defendants made false and fraudulent statements and concealed material facts in a calculated effort to induce Allstate to pay charges submitted by Defendants that were not compensable under the No-Fault Laws.

248.    Allstate justifiably relied on the Defendants' false and fraudulent representations, and as a proximate result have incurred damages of more than Ninety-Three Thousand ($93,000.00) Dollars based upon the fraudulent charges.

249.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

250.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTIETH CAUSE OF ACTION
### AGAINST DR. GERIS, JMP, AND DR. TSIRLIN
(Unjust Enrichment)

251.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 250 above.

252.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Allstate.

253.    When Allstate paid the bills and charges submitted by or on behalf of JMP for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

254.    Defendants have been enriched at Allstate's expense by Allstate's payments which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

255.    Defendants' retention of Allstate's payments violates fundamental principles of justice, equity and good conscience.

256.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of Ninety-Three Thousand ($93,000.00) Dollars.

### TWENTY-FIRST CAUSE OF ACTION
### AGAINST DR. TSIRLIN
(Aiding and Abetting)

257.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 256 above.

258.    Dr. Tsirlin knowingly aided and abetted the fraudulent scheme that was perpetrated on Allstate by Dr. Geris and JMP.  The acts of Dr. Tsirlin in furtherance of the fraudulent scheme include: (i) knowingly conducting medically unnecessary Consultations in exchange for payment of money; and (ii) knowingly recommending and performing medically unnecessary EDX Tests and issuing fraudulent reports in exchange for payment of money from Dr. Geris and JMP.

259.    The conduct of Dr. Tsirlin in furtherance of the fraudulent scheme is significant and material. The conduct of Dr. Tsirlin is a necessary part of and is critical to the success of the fraudulent scheme because without his actions, including the performance of the fraudulent Consultations, the recommendations for and performance of the fraudulent EDX Tests and the issuance of the fraudulent EDX Testing reports, there would be no opportunity for Dr. Geris and JMP to obtain payment from Allstate and from other insurers.

260.    Dr. Tsirlin aided and abetted the fraudulent scheme in a calculated effort to induce Allstate into paying charges to JMP for medically unnecessary services that were not compensable under New York's No-Fault Laws, because he sought to continue profiting through the fraudulent scheme.

261.    The conduct of Dr. Tsirlin caused Allstate to pay more than Ninety-Three Thousand ($93,000.00) Dollars based upon the fraudulent charges submitted through JMP.

262.    Dr. Tsirlin's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

263.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTY-SECOND CAUSE OF ACTION
### AGAINST DR. DAVIDOV, S&R, AND DR. TSIRLIN
(Violation of 18 U.S.C. § 1962(c))

264.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 263 above.

265.    Dr. Davidov, S&R, and Dr. Tsirlin (the Davidov Fraudulent Testing Enterprise") constitute an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce. The members of the Davidov Fraudulent Testing Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Dr. Davidov is the physician who incorporated S&R, purports to act as the sole shareholder, director and officer of the professional corporation and oversees the operations on a day-to-day basis, and purports to perform and issue reports based upon many of the fraudulent medical services, including the Examinations and ROM/Muscle Tests.  S&R was created to facilitate the submission of fraudulent charges to Allstate.  Dr. Tsirlin falsely purports to be an employee of S&R, purports to perform the Consultations and EDX Tests; and issues false reports

relating to the Consultations and EDX Tests to support the fraudulent charges, in order to permit S&R to bill for and collect No-Fault Benefits to which it is not entitled. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Davidov Fraudulent Testing Enterprise acting singly or without the aid of each other.

266. The Davidov Fraudulent Testing Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to Allstate and other insurers), by creating and maintaining patient files and other records resulting from the performance of the Fraudulent Services, by recruiting and supervising personnel, by negotiating and executing various billing and collection agreements, facility lease agreements, equipment lease agreements and management agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

267. Dr. Davidov, S&R, and Dr. Tsirlin each was employed by and/or associated with the Davidov Fraudulent Testing Enterprise.

268. Dr. Davidov, S&R, and Dr. Tsirlin knowingly conducted and/or participated, directly and/or indirectly, in the conduct of the Davidov Fraudulent Testing Enterprise through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent bills on a continuous basis over more than two (2) years.

Furthermore, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as the Davidov Fraudulent Testing Enterprise continues to submit and attempt collection on fraudulent billing to the present day. These acts of mail fraud include, but are not limited to, those that are described in the chart annexed hereto as Exhibit "5".

269.     Each of these predicate acts of mail fraud constituted an inherently unlawful act committed at the behest of the Davidov Fraudulent Testing Enterprise, an organization whose business is racketeering activity. These predicate acts of mail fraud were the regular way in which the Defendants operated the Davidov Fraudulent Testing Enterprise, inasmuch as S&R never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the Davidov Fraudulent Testing Enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity.

270.     The Defendants continue to attempt collection on the fraudulent billing.

271.     Allstate has been injured in its business and property by reason of the above conduct in that it has paid more than Two Hundred and Twenty Thousand ($220,000.00) Dollars pursuant to the fraudulent bills submitted through S&R.

272.     By reason of its injury, Allstate is entitled to treble damages, costs and reasonable attorney's fees pursuant to 18 U.S.C. Section 1964(c), and any other relief the Court deems just and proper.

## TWENTY-THIRD CAUSE OF ACTION
## AGAINST DR. DAVIDOV, S&R, AND DR. TSIRLIN
(Violation of 18 U.S.C. § 1962(d))

273.     Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 272 above.

274.     All of the members of the Davidov Fraudulent Testing Enterprise knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Davidov Fraudulent Testing Enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent bills to Allstate. These acts of mail fraud include, but are not limited to, those that are described in the chart annexed hereto as Exhibit "5". Each such mailing was made in furtherance of the mail fraud scheme.

275.     Each member of the Davidov Fraudulent Testing Enterprise knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud Allstate and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Allstate.

276.     Allstate has been injured in its business and property by reason of the above conduct in that it has paid more than Two Hundred and Twenty Thousand ($220,000.00) Dollars pursuant to the fraudulent bills submitted through S&R.

277.     By reason of its injury, Allstate is entitled to treble damages, costs and reasonable attorney's fees pursuant to 18 U.S.C. Section 1964(c), and any other relief the Court deems just and proper.

### TWENTY-FOURTH CAUSE OF ACTION
### AGAINST DR. DAVIDOV, S&R, AND DR. TSIRLIN
(Common Law Fraud)

278.     Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 277 above.

279.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to Allstate by submitting, or causing to be submitted, thousands of fraudulent bills that included charges for the medically unnecessary Examinations, ROM/Muscle Tests, Consultations, and EDX Tests.

280.    These false and fraudulent statements of material fact include the representations in every claim that S&R was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11(a) for the services that allegedly were performed, when in fact it was not eligible to seek or pursue collection of No-Fault Benefits associated with the services because the services were not provided by its employees.

281.    In addition, these false and fraudulent statements of material fact include the representations in every claim submitted or caused to be submitted by or through Dr. Davidov, S&R, and/or Dr. Tsirlin that the Fraudulent Services were medically necessary when, in fact, they were not. Indeed, the Defendants knew that the Fraudulent Services were ordered and performed pursuant to pre-determined fraudulent protocols designed solely to facilitate charges from S&R, and to support the laundry list of medically unnecessary services purportedly rendered to Insureds by or at the direction of the Defendants.

282.    The Defendants made false and fraudulent statements and concealed material facts in a calculated effort to induce Allstate to pay charges submitted by Defendants that were not compensable under the No-Fault Laws.

283.    Allstate justifiably relied on the Defendants' false and fraudulent representations, and as a proximate result have incurred damages of more than Two Hundred and Twenty Thousand ($220,000.00) Dollars based upon the fraudulent charges.

284.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

285.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTY-FIFTH CAUSE OF ACTION
### AGAINST DR. DAVIDOV, S&R, AND DR. TSIRLIN
(Unjust Enrichment)

286.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 285 above.

287.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Allstate.

288.    When Allstate paid the bills and charges submitted by or on behalf of S&R for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

289.    Defendants have been enriched at Allstate's expense by Allstate's payments which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

290.    Defendants' retention of Allstate's payments violates fundamental principles of justice, equity and good conscience.

291.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of Two Hundred and Twenty Thousand ($220,000.00) Dollars.

TWENTY-SIXTH CAUSE OF ACTION
AGAINST DR. TSIRLIN
(Aiding and Abetting)

292.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 291 above.

293.    Dr. Tsirlin knowingly aided and abetted the fraudulent scheme that was perpetrated on Allstate by Dr. Davidov and S&R. The acts of Dr. Tsirlin in furtherance of the fraudulent scheme include: (i) knowingly conducting medically unnecessary Consultations in exchange for payment of money; and (ii) knowingly recommending and performing medically unnecessary EDX Tests and issuing fraudulent reports in exchange for payment of money from Dr. Davidov and S&R.

294.    The conduct of Dr. Tsirlin in furtherance of the fraudulent scheme is significant and material. The conduct of Dr. Tsirlin is a necessary part of and is critical to the success of the fraudulent scheme because without his actions, including the performance of the fraudulent Consultations, the recommendations for and performance of the fraudulent EDX Tests and the issuance of the fraudulent EDX Testing reports, there would be no opportunity for Dr. Davidov and S&R to obtain payment from Allstate and from other insurers.

295.    Dr. Tsirlin aided and abetted the fraudulent scheme in a calculated effort to induce Allstate into paying charges to S&R for medically unnecessary services that were not compensable under New York's No-Fault Laws, because he sought to continue profiting through the fraudulent scheme.

296.    The conduct of Dr. Tsirlin caused Allstate to pay more than Two Hundred and Twenty Thousand ($220,000.00) Dollars based upon the fraudulent charges submitted through S&R.

297.   Dr. Tsirlin's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

298.   Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTY-SEVENTH CAUSE OF ACTION**
**AGAINST DR. NAGOURNEY, AMETHYST, AKO AND DR. TSIRLIN**
(Violation of 18 U.S.C. § 1962(c))

299.   Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 298 above.

300.   Dr. Nagourney, Amethyst, AKO, and Dr. Tsirlin ("the Nagourney Fraudulent Testing Enterprise") constitute an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce. The members of the Nagourney Fraudulent Testing Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Dr. Nagourney is the physician who incorporated Amethyst and AKO, purports to act as the sole shareholder, director and officer of the professional corporations and oversees the operations on a day-to-day basis, and purports to perform and issue reports based upon many of the fraudulent medical services, including the Examinations and ROM/Muscle Tests.  Amethyst and AKO ostensibly are independent entities – with different names and tax identification numbers – that were created as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to Allstate.  The Nagourney Fraudulent Testing Enterprise has been operated under two separate corporate names

in order to reduce the number of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of Allstate and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one company. Dr. Tsirlin falsely purports to be an employee of Amethyst and AKO; purport to perform the Consultations and EDX Tests; and issues false reports relating to the Consultations and EDX Tests to support the fraudulent charges, in order to permit Amethyst and AKO to bill for and collect No-Fault Benefits to which they are not entitled. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Nagourney Fraudulent Testing Enterprise acting singly or without the aid of each other.

301.    The Nagourney Fraudulent Testing Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to Allstate and other insurers), by creating and maintaining patient files and other records resulting from the performance of the Fraudulent Services, by recruiting and supervising personnel, by negotiating and executing various billing and collection agreements, facility lease agreements, equipment lease agreements and management agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

302.    Dr. Nagourney, Amethyst, AKO, and Dr. Tsirlin each was employed by and/or associated with the Nagourney Fraudulent Testing Enterprise.

303.    Dr. Nagourney, Amethyst, AKO, and Dr. Tsirlin knowingly conducted and/or participated, directly and/or indirectly, in the conduct of the Nagourney Fraudulent Testing Enterprise through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent bills on a continuous basis over more than three (3) years. Furthermore, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as the Nagourney Fraudulent Testing Enterprise continues to submit and attempt collection on fraudulent billing to the present day. These acts of mail fraud include, but are not limited to, those that are described in the chart annexed hereto as Exhibit "6".

304.    Each of these predicate acts of mail fraud constituted an inherently unlawful act committed at the behest of the Nagourney Fraudulent Testing Enterprise, an organization whose business is racketeering activity. These predicate acts of mail fraud were the regular way in which the Defendants operated the Nagourney Fraudulent Testing Enterprise, inasmuch as Amethyst and AKO never were eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the Nagourney Fraudulent Testing Enterprise to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity.

305.    The Defendants continue to attempt collection on the fraudulent billing.

306.    Allstate has been injured in its business and property by reason of the above conduct in that it has paid more than One Hundred Forty-Seven Thousand ($147,000.00) Dollars pursuant to the fraudulent bills submitted through Amethyst and AKO.

307. By reason of its injury, Allstate is entitled to treble damages, costs and reasonable attorney's fees pursuant to 18 U.S.C. Section 1964(c), and any other relief the Court deems just and proper.

## TWENTY-EIGHTH CAUSE OF ACTION
## AGAINST DR. NAGOURNEY, AMETHYST, AKO AND DR. TSIRLIN
(Violation of 18 U.S.C. § 1962(d))

308. Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 307 above.

309. All of the members of the Nagourney Fraudulent Testing Enterprise knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Nagourney Fraudulent Testing Enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent bills to Allstate. These acts of mail fraud include, but are not limited to, those that are described in the chart annexed hereto as Exhibit "6". Each such mailing was made in furtherance of the mail fraud scheme.

310. Each member of the Nagourney Fraudulent Testing Enterprise knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud Allstate and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Allstate.

311. Allstate has been injured in its business and property by reason of the above conduct in that it has paid more than One Hundred Forty-Seven Thousand ($147,000.00) Dollars pursuant to the fraudulent bills submitted through Amethyst and AKO.

312.    By reason of its injury, Allstate is entitled to treble damages, costs and reasonable attorney's fees pursuant to 18 U.S.C. Section 1964(c), and any other relief the Court deems just and proper.

## TWENTY-NINTH CAUSE OF ACTION
## AGAINST DR. NAGOURNEY, AMETHYST, AKO AND DR. TSIRLIN
(Common Law Fraud)

313.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 312 above.

314.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to Allstate by submitting, or causing to be submitted, thousands of fraudulent bills that included charges for the medically unnecessary Examinations, ROM/Muscle Tests, Consultations, and EDX Tests.

315.    These false and fraudulent statements of material fact include the representations in every claim that Amethyst and/or AKO were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11(a) for the services that allegedly were performed, when in fact they were not eligible to seek or pursue collection of No-Fault Benefits associated with the services because the services were not provided by their employees.

316.    In addition, these false and fraudulent statements of material fact include the representations in every claim submitted or caused to be submitted by or through Dr. Nagourney, Amethyst, AKO and/or Dr. Tsirlin that the Fraudulent Services were medically necessary when, in fact, they were not. Indeed, the Defendants knew that the Fraudulent Services were ordered and performed pursuant to pre-determined fraudulent protocols designed solely to facilitate charges from Amethyst and/or AKO, and to support the laundry list of medically unnecessary services purportedly rendered to Insureds by or at the direction of the Defendants.

317.    The Defendants made false and fraudulent statements and concealed material facts in a calculated effort to induce Allstate to pay charges submitted by Defendants that were not compensable under the No-Fault Laws.

318.    Allstate justifiably relied on the Defendants' false and fraudulent representations, and as a proximate result have incurred damages of more than One Hundred Forty-Seven Thousand ($147,000.00) Dollars based upon the fraudulent charges.

319.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

320.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTIETH CAUSE OF ACTION
## AGAINST DR. NAGOURNEY, AMETHYST, AKO AND DR. TSIRLIN
(Unjust Enrichment)

321.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 320 above.

322.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Allstate.

323.    When Allstate paid the bills and charges submitted by or on behalf of Amethyst and AKO for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

324.   Defendants have been enriched at Allstate's expense by Allstate's payments which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

325.   Defendants' retention of Allstate's payments violates fundamental principles of justice, equity and good conscience.

326.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of One Hundred Forty-Seven Thousand ($147,000.00) Dollars.

## THIRTY-FIRST CAUSE OF ACTION
## AGAINST DR. TSIRLIN
(Aiding and Abetting)

327.   Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 327 above.

328.   Dr. Tsirlin knowingly aided and abetted the fraudulent scheme that was perpetrated on Allstate by Dr. Nagourney, Amethyst, and AKO.  The acts of Dr. Tsirlin in furtherance of the fraudulent scheme include: (i) knowingly conducting medically unnecessary Consultations in exchange for payment of money; and (ii) knowingly recommending and performing medically unnecessary EDX Tests and issuing fraudulent reports in exchange for payment of money from Dr. Nagourney, Amethyst, and AKO.

329.   The conduct of Dr. Tsirlin in furtherance of the fraudulent scheme is significant and material. The conduct of Dr. Tsirlin is a necessary part of and is critical to the success of the fraudulent scheme because without his actions, including the performance of the fraudulent Consultations, the recommendations for and performance of the fraudulent EDX Tests and the

issuance of the fraudulent EDX Testing reports, there would be no opportunity for Dr. Nagourney, Amethyst, and AKO to obtain payment from Allstate and from other insurers.

330.    Dr. Tsirlin aided and abetted the fraudulent scheme in a calculated effort to induce Allstate into paying charges to Amethyst and AKO for medically unnecessary services that were not compensable under New York's No-Fault Laws, because he sought to continue profiting through the fraudulent scheme.

331.    The conduct of Dr. Tsirlin caused Allstate to pay more than One Hundred Forty-Seven Thousand ($147,000.00) Dollars based upon the fraudulent charges submitted through Amethyst and AKO.

332.    Dr. Tsirlin's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

333.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTY-SECOND CAUSE OF ACTION
## AGAINST DR. LAGODUKE, MEDICAL POLIS, AND DR. KIM
(Violation of 18 U.S.C. § 1962(c))

334.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 334 above.

335.    Dr. Lagoduke, MP, and Dr. Kim (the Lagoduke Fraudulent Testing Enterprise") constitute an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce. The members of the Lagoduke Fraudulent Testing Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with

each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Dr. Lagoduke is the physician who incorporated MP, purports to act as the sole shareholder, director and officer of the professional corporation and oversees the operations on a day-to-day basis, and purports to perform and issue reports based upon many of the fraudulent medical services, including the Examinations and ROM/Muscle Tests. MP was created to facilitate the submission of fraudulent charges to Allstate. Dr. Kim falsely purports to be an employee of MP, purports to perform the Consultations and EDX Tests; and issues false reports relating to the Consultations and EDX Tests to support the fraudulent charges, in order to permit MP to bill for and collect No-Fault Benefits to which it is not entitled. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Lagoduke Fraudulent Testing Enterprise acting singly or without the aid of each other.

336.    The Lagoduke Fraudulent Testing Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to Allstate and other insurers), by creating and maintaining patient files and other records resulting from the performance of the Fraudulent Services, by recruiting and supervising personnel, by negotiating and executing various billing and collection agreements, facility lease agreements, equipment lease agreements and management agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

337.   Dr. Lagoduke, MP, and Dr. Kim each was employed by and/or associated with the Lagoduke Fraudulent Testing Enterprise.

338.   Dr. Lagoduke, MP, and Dr. Kim knowingly conducted and/or participated, directly and/or indirectly, in the conduct of the Lagoduke Fraudulent Testing Enterprise through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent bills on a continuous basis over more than two (2) years. Furthermore, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as the Lagoduke Fraudulent Testing Enterprise continues to submit and attempt collection on fraudulent billing to the present day. These acts of mail fraud include, but are not limited to, those that are described in the chart annexed hereto as Exhibit "7".

339.   Each of these predicate acts of mail fraud constituted an inherently unlawful act committed at the behest of the Lagoduke Fraudulent Testing Enterprise, an organization whose business is racketeering activity. These predicate acts of mail fraud were the regular way in which the Defendants operated the Lagoduke Fraudulent Testing Enterprise, inasmuch as MP never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the Lagoduke Fraudulent Testing Enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity.

340.   The Defendants continue to attempt collection on the fraudulent billing.

341.   Allstate has been injured in its business and property by reason of the above conduct in that it has paid more than Seventy-Five Thousand ($75,000.00) Dollars pursuant to the fraudulent bills submitted through MP.

342.    By reason of its injury, Allstate is entitled to treble damages, costs and reasonable attorney's fees pursuant to 18 U.S.C. Section 1964(c), and any other relief the Court deems just and proper.

## THIRTY-THIRD CAUSE OF ACTION
## AGAINST DR. LAGODUKE, MEDICAL POLIS, AND DR. KIM
(Violation of 18 U.S.C. § 1962(d))

343.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 342 above.

344.    All of the members of the Lagoduke Fraudulent Testing Enterprise knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Lagoduke Fraudulent Testing Enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent bills to Allstate.    These acts of mail fraud include, but are not limited to, those that are described in the chart annexed hereto as Exhibit "7". Each such mailing was made in furtherance of the mail fraud scheme.

345.    Each member of the Lagoduke Fraudulent Testing Enterprise knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud Allstate and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Allstate.

346.    Allstate has been injured in its business and property by reason of the above conduct in that it has paid more than Seventy-Five Thousand ($75,000.00) Dollars pursuant to the fraudulent bills submitted through MP.

347.   By reason of its injury, Allstate is entitled to treble damages, costs and reasonable attorney's fees pursuant to 18 U.S.C. Section 1964(c), and any other relief the Court deems just and proper.

**THIRTY-FOURTH CAUSE OF ACTION**
**AGAINST DR. LAGODUKE, MEDICAL POLIS, AND DR. KIM**
(Common Law Fraud)

348.   Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 347 above.

349.   The Defendants intentionally and knowingly made false and fraudulent statements of material fact to Allstate by submitting, or causing to be submitted, thousands of fraudulent bills that included charges for the medically unnecessary Examinations, ROM/Muscle Tests, Consultations, and EDX Tests.

350.   These false and fraudulent statements of material fact include the representations in every claim that MP was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11(a) for the services that allegedly were performed, when in fact it was not eligible to seek or pursue collection of No-Fault Benefits associated with the services because the services were not provided by its employees.

351.   In addition, these false and fraudulent statements of material fact include the representations in every claim submitted or caused to be submitted by or through Dr. Lagoduke, MP, and/or Dr. Kim that the Fraudulent Services were medically necessary when, in fact, they were not. Indeed, the Defendants knew that the Fraudulent Services were ordered and performed pursuant to pre-determined fraudulent protocols designed solely to facilitate charges from MP, and to support the laundry list of medically unnecessary services purportedly rendered to Insureds by or at the direction of the Defendants.

352.    The Defendants made false and fraudulent statements and concealed material facts in a calculated effort to induce Allstate to pay charges submitted by Defendants that were not compensable under the No-Fault Laws.

353.    Allstate justifiably relied on the Defendants' false and fraudulent representations, and as a proximate result have incurred damages of more than Seventy-Five Thousand ($75,000.00) Dollars based upon the fraudulent charges.

354.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

355.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRTY-FIFTH CAUSE OF ACTION
### AGAINST DR. LAGODUKE, MEDICAL POLIS, AND DR. KIM
(Unjust Enrichment)

356.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 355 above.

357.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Allstate.

358.    When Allstate paid the bills and charges submitted by or on behalf of MP for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

359.    Defendants have been enriched at Allstate's expense by Allstate's payments which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

360.    Defendants' retention of Allstate's payments violates fundamental principles of justice, equity and good conscience.

361.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of Seventy-Five Thousand ($75,000.00) Dollars.

**THIRTY-SIXTH CAUSE OF ACTION
AGAINST DR. KIM**
(Aiding and Abetting)

362.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 361 above.

363.    Dr. Kim knowingly aided and abetted the fraudulent scheme that was perpetrated on Allstate by Dr. Lagoduke and MP.  The acts of Dr. Kim in furtherance of the fraudulent scheme include: (i) knowingly conducting medically unnecessary Consultations in exchange for payment of money; and (ii) knowingly recommending and performing medically unnecessary EDX Tests and issuing fraudulent reports in exchange for payment of money from Dr. Lagoduke and MP.

364.    The conduct of Dr. Kim in furtherance of the fraudulent scheme is significant and material. The conduct of Dr. Kim is a necessary part of and is critical to the success of the fraudulent scheme because without his actions, including the performance of the fraudulent Consultations, the recommendations for and performance of the fraudulent EDX Tests and the issuance of the fraudulent EDX Testing reports, there would be no opportunity for Dr. Lagoduke and MP to obtain payment from Allstate and from other insurers.

365.    Dr. Kim aided and abetted the fraudulent scheme in a calculated effort to induce Allstate into paying charges to MP for medically unnecessary services that were not compensable

under New York's No-Fault Laws, because he sought to continue profiting through the fraudulent scheme.

366.     The conduct of Dr. Kim caused Allstate to pay more than Seventy-Five Thousand ($75,000.00) Dollars based upon the fraudulent charges submitted through MP.

367.     Dr. Kim's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

368.     Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## JURY DEMAND

369.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury.

**WHEREFORE**, Plaintiff Allstate Insurance Company demands that a Judgment be entered in its favor:

A.     on its First Cause of Action, declaring that the PC Defendants have no right to receive payment for any pending bills submitted to Allstate;

B.     on its Second Cause of Action against Dr. Etienne, VE, VEMC, JDMC, Dr. Kim, and Dr. Morr, for more than $648,000.00 in compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     on its Third Cause of Action against Dr. Etienne, VE, VEMC, JDMC, Dr. Kim, and Dr. Morr for more than $648,000.00 in compensatory damages, together with

treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      on its Fourth Cause of Action against Dr. Etienne, VE, VEMC, JDMC, Dr. Kim, and Dr. Morr for more than $648,000.00 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      on its Fifth Cause of Action against Dr. Etienne, VE, VEMC, JDMC, Dr. Kim, and Dr. Morr for more than $648,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F.      on its Sixth Cause of Action against Dr. Kim and Dr. Morr for more than $648,000.00 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.      on its Seventh Cause of Action against Dr. Shevetz, Sebastian, Acute, and Dr. Kim for more than $125,000.00 in compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      on its Eighth Cause of Action against Dr. Shevetz, Sebastian, Acute, and Dr. Kim for more than $125,000.00 in compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      on its Ninth Cause of Action against Dr. Shevetz, Sebastian, Acute, and Dr. Kim for more than $125,000.00 in compensatory damages, together with punitive

damages, costs, interest and such other and further relief as this Court deems just and proper;

J.      on its Tenth Cause of Action against Dr. Shevetz, Sebastian, Acute, and Dr. Kim for more than $125,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

K.      on its Eleventh Cause of Action against Dr. Kim for more than $125,000.00 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

L.      on its Twelfth Cause of Action against Dr. Berardi, Arco, Neomy, Kath, Dr. Kim, Dr. Morr, and Dr. Tsirlin for more than $469,000.00 in compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

M.      on its Thirteenth Cause of Action against Dr. Berardi, Arco, Neomy, Kath, Dr. Kim, Dr. Morr, and Dr. Tsirlin for more than $469,000.00 in compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N.      on its Fourteenth Cause of Action against Dr. Berardi, Arco, Neomy, Kath, Dr. Kim, Dr. Morr, and Dr. Tsirlin for more than $469,000.00 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O.      on its Fifteenth Cause of Action against Dr. Berardi, Arco, Neomy, Kath, Dr. Kim, Dr. Morr, and Dr. Tsirlin for more than $469,000.00 in compensatory

damages, plus costs and interest and such other and further relief as this Court deems just and proper;

P.    on its Sixteenth Cause of Action against Dr. Kim, Dr. Tsirlin and Dr. Morr for more than $469,000.00 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Q.    on its Seventeenth Cause of Action against Dr. Geris, JMP, and Dr. Tsirlin for more than $93,000.00 in compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

R.    on its Eighteenth Cause of Action against Dr. Geris, JMP, and Dr. Tsirlin for more than $93,000.00 in compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.    on its Nineteenth Cause of Action against Dr. Geris, JMP, and Dr. Tsirlin for more than $93,000.00 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

T.    on its Twentieth Cause of Action against Dr. Geris, JMP, and Dr. Tsirlin for more than $93,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

U.    on its Twenty-First Cause of Action against Dr. Tsirlin for more than $93,000.00 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

V.    on its Twenty-Second Cause of Action against Dr. Davidov, S&R, and Dr. Tsirlin for more than $220,000.00 in compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

W.    On its Twenty-Third Cause of Action against Dr. Davidov, S&R, and Dr. Tsirlin for more than $220,000.00 in compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

X.    on its Twenty-Fourth Cause of Action against Dr. Davidov, S&R, and Dr. Tsirlin for more than $220,000.00 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Y.    on its Twenty-Fifth Cause of Action against Dr. Davidov, S&R, and Dr. Tsirlin for more than $220,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

Z.    on its Twenty-Sixth Cause of Action against Dr. Tsirlin for more than $220,000.00 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

AA.   on its Twenty-Seventh Cause of Action against Dr. Nagourney, Amethyst, AKO, and Dr. Tsirlin for more than $147,000.00 in compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

BB.   on its Twenty-Eighth Cause of Action against Dr. Nagourney, Amethyst, AKO, and Dr. Tsirlin for more than $147,000.00 in compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

CC.   on its Twenty-Ninth Cause of Action against Dr. Nagourney, Amethyst, AKO, and Dr. Tsirlin for more than $147,000.00 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

DD.   on its Thirtieth Cause of Action against Dr. Nagourney, Amethyst, AKO, and Dr. Tsirlin for more than $147,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

EE.   on its Thirty-First Cause of Action against Dr. Tsirlin for more than $147,000.00 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

FF.   On its Thirty-Second Cause of Action against Dr. Lagoduke, MP, and Dr. Kim for more than $75,000.00 in compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

GG.   On its Thirty-Third Cause of Action against Dr. Lagoduke, MP, and Dr. Kim for more than $75,000.00 in compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

HH.   on its Thirty-Fourth Cause of Action against Dr. Lagoduke, MP, and Dr. Kim for more than $75,000.00 in compensatory damages, together with punitive damages,

costs, interest and such other and further relief as this Court deems just and proper;

II.     on its Thirty-Fifth Cause of Action against Dr. Lagoduke, MP, and Dr. Kim for more than $75,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

JJ.     on its Thirty-Sixth Cause of Action against Dr. Kim for more than $75,000.00 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

KK.     awarding Plaintiff its costs including reasonable attorneys' fees, and any other relief the Court deems just and proper.

Dated: August 18, 2009

RIVKIN RADLER LLP

By:_____
        Barry I. Levy (BL 2190)
        Max Gershenoff (MG 4648)
        926 RXR Plaza
        Uniondale, New York  11556
        (516) 357-3000
        (516) 357-3333 (facsimile)

*Counsel for Plaintiff, Allstate Insurance Company*